REVISED August 24, 2007

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 17, 2007**

Charles R. Fulbruge III
Clerk

No. 06-60723

ROBERT J MERLO

Petitioner - Appellant

v.

COMMISSIONER OF INTERNAL REVENUE

Respondent - Appellee

Appeal from the United States Tax Court

Before KING, DAVIS, and BARKSDALE, Circuit Judges.

KING, Circuit Judge:

Petitioner-appellant Robert Merlo exercised an incentive stock option in 2000. In an action brought to determine his federal income tax liability, the tax court held that for alternative minimum tax purposes, Merlo realized income from the option's exercise in 2000. The stock became worthless in 2001, and the tax court held that the resulting capital loss could not be carried back as an alternative tax net operating loss to 2000 to offset the income from the option's exercise. We AFFIRM.

I. FACTUAL AND PROCEDURAL BACKGROUND

In December 2000, petitioner-appellant Robert Merlo purchased stock by exercising an incentive stock option given to him by his employer, Exodus Communications, Inc. ("Exodus"), a publicly traded company. Merlo purchased the stock at a significant discount to market, paying only $9225 when the fair market value of the stock on the date of exercise equaled $1,075,289. Exodus's insider trading policy prevented employees from trading the company's stock during certain blackout periods. Employees could, however, acquire stock by exercising a stock option during a blackout period, and that is what Merlo did.

Soon after Merlo exercised his option, the stock's value declined rapidly and, in the vernacular, he rode the stock all the way to the bottom. Approximately nine months later, Exodus filed for bankruptcy. In November 2001, Exodus declared its stock worthless.

On his income tax return for 2000, Merlo reported that the exercise of the stock option generated taxable income for alternative minimum tax ("AMT") purposes. Merlo calculated the income as the difference between the price he paid when he exercised the option and the market price on April 15, 2001.[1] The IRS concluded that Merlo should have used the date of exercise, December 21, 2000, as the valuation date to calculate his alternative minimum taxable income ("AMTI") and that by using an improper valuation date, Merlo had significantly understated his AMTI. The IRS issued a notice of deficiency to Merlo, asserting that he owed an additional $169,510 in tax for the year 2000.

After receiving the deficiency notice, Merlo attempted to file an amended tax return, reflecting no AMTI (and thus no AMT) for 2000. He took the position on the amended return that he realized no AMTI when he exercised the option

---

[1] Legislation pending in Congress when Merlo filed his tax return would have allowed him to use an April 15, 2001 valuation date. But Congress never enacted the legislation.

because the shares purchased were subject to a substantial risk of forfeiture. But the IRS rejected his amended return.

Next Merlo contested the deficiency notice in the tax court, and the parties stipulated to the facts. The parties submitted cross-motions for partial summary judgment on the issue of whether the stock was held subject to a substantial risk of forfeiture. The tax court decided that no substantial risk of forfeiture existed because the option's terms did not include a sellback provision and the evidence did not indicate that Exodus could have compelled Merlo to return his shares after he exercised the option.

Another issue on summary judgment was whether the loss incurred when the Exodus stock became worthless entitled Merlo to an alternative tax net operating loss ("ATNOL") carry back deduction which would have allowed Merlo to offset the income generated in 2000 with the loss suffered the following year. The tax court again found for the IRS, holding that because the capital loss limitations applicable to the regular income tax regime also applied to the AMT, Merlo could not carry back an ATNOL.

Merlo now appeals, arguing that the tax court improperly granted summary judgment for the IRS.

## II. DISCUSSION

We review tax court decisions in the same manner as we do civil actions decided by a federal district court. 26 U.S.C. § 7482(a). As the parties submitted this case for summary judgment on stipulated facts, only conclusions of law are at issue and we review the judgment de novo. See Houston Oil and Minerals Corp. v. Comm'r, 922 F.2d 283, 285 (5th Cir. 1991).

Merlo was subject to the AMT, which is separate from and in addition to the regular income tax. I.R.C. § 55(a). Congress enacted the AMT to ensure that high-income taxpayers cannot avoid significant tax liability through the use of

exclusions, deductions, and credits. Snap-Drape, Inc. v. Comm'r, 98 F.3d 194, 199 (5th Cir. 1996); 1 AMELIA LEGUTKI, MERTENS LAW OF FEDERAL INCOME TAXATION § 2A:01 (2004). Although the AMT is imposed at a lower rate than the regular income tax, it is applied to a substantially expanded income base known as alternative minimum taxable income ("AMTI"). I.R.C. §§ 56, 58; see also 1 LEGUTKI, supra, § 2A:01. The AMTI base is created by eliminating tax-breaks given to the taxpayer under the regular income tax regime, such as the preferred treatment given to qualified incentive stock options. See, e.g., I.R.C. § 56(b)(3); Snap-Drape, Inc., 98 F.3d at 199 (recognizing that deductions or exclusions from income under the regular income tax regime are not available in computing AMTI, including the exclusion for interest on private activity bonds).

The difference between the stock option price and the stock's fair market value on the date of exercise is a substantial economic benefit. See Comm'r v. LoBue, 351 U.S. 243, 247-48 (1956); Comm'r v. Smith, 324 U.S. 177, 181-82 (1945); McDonald v. Comm'r, 764 F.2d 322, 326 (5th Cir. 1985). Under the regular income tax, if an option meets the requirements of an employee incentive stock option under Internal Revenue Code ("I.R.C." or "the Code") § 422, that difference is not taxed as income when the option is exercised but instead upon the disposition of the stock. I.R.C. § 421(a)(1). But that tax-deferred treatment is eliminated for purposes of the AMT. I.R.C. § 56(b)(3). Instead, the difference between the option price and the fair market value must be recognized in the taxpayer's AMTI under the general rules of § 83, the statute governing stock options that do not satisfy the requirements of § 422.

Merlo seeks to recognize both the income and the loss from the Exodus stock in the same taxable year for AMT purposes and thereby reduce his deficiency. Merlo first argues that income from the stock option should have

been recognized in 2001, not 2000, because in 2000 he was not substantially vested in the property. Alternatively, Merlo asserts that an exception to the capital loss limitations applies that would allow him to carry back the loss in 2001 to 2000 as an ATNOL.

A. Substantial Risk of Forfeiture

Merlo argues that he did not realize AMTI in 2000 because the blackout period was in effect on the date he exercised the option and remained in effect throughout the remainder of the year, creating a substantial risk of forfeiture. Section 83(a) of the I.R.C. provides that income from an option's exercise is included in gross income "in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture." I.R.C. § 83(a). In other words, § 83 seeks to tax the receipt of property when the property is "substantially vested." Treas. Reg. § 1.83-1(a). And property is substantially vested at the first point at which it is either transferable by the recipient taxpayer or not subject to a substantial risk of forfeiture. Id. § 1.83-3(b).

Although Merlo could not transfer his stock until the blackout period lapsed, he would nevertheless have been substantially vested in the stock so long as the stock was not subject to a substantial risk of forfeiture. Whether there is a substantial risk of forfeiture in a particular case depends on the individual facts and circumstances, id. § 1.83-3(c)(1), though the I.R.C. and Treasury Regulations provide some guidance with regard to what constitutes a substantial risk of forfeiture. For example, property is subject to a substantial risk of forfeiture where rights in the property are conditioned on the future

5

performance of services by any individual.[2] I.R.C. § 83(c)(1). But property is not "subject to a substantial risk of forfeiture to the extent that the employer is required to pay the fair market value of a portion of such property to the employee upon the return of such property." Treas. Reg. § 1.83-3(c)(1). Further, neither the risk that the property's value will decline during a certain time period nor a requirement that the property be returned to the employer if the employee is discharged for cause or for committing a crime constitutes a substantial risk of forfeiture. Id. § 1.83-3(c)(1), (2).

In support of his theory, Merlo argues that his circumstances are analogous to those of the taxpayer in Robinson v. Commissioner, 805 F.2d 38 (1st Cir. 1986). In Robinson, the taxpayer's stock option agreement featured a provision that required the taxpayer to sell his shares back to the company at his original cost if he desired to sell his stock within one year of the exercise of the option. 805 F.2d at 39. The First Circuit identified the sellback provision as the distinguishing characteristic of the option and concluded that when combined with the significant business purpose of preventing insider trading, it created a substantial risk of forfeiture that existed until the sellback provision lapsed. Id. at 41.

In this case, the tax court distinguished Robinson on its facts, recognizing that Merlo had not shown that Exodus could have compelled him to return his shares of stock. It held that the remedy chosen by Exodus to enforce its insider trading policy was disciplinary action against the employee, not a forfeiture of the shares.

---

[2] Section 83(c)(1) provides that "[t]he rights of a person in property are subject to a substantial risk of forfeiture if such person's rights to full enjoyment of such property are conditioned upon the future performance of substantial services by any individual." I.R.C. § 83(c)(1).

We agree with the tax court. Merlo has failed to identify a sellback provision similar to the one in Robinson. The blackout period within the insider trading policy is insufficient to create a substantial risk of forfeiture because the remedy for non-compliance does not include forfeiture of the shares. See Theophilos v. Comm'r, 85 F.3d 440, 447 n.18 (9th Cir. 1996) (holding that in determining whether a substantial risk of forfeiture exists, the court must determine whether the employee can lose his rights in the property). The mere fact that a restriction prevented Merlo from transferring the shares during the blackout period was not enough to cause Merlo to forfeit the shares.

Merlo also asserts that a substantial risk of forfeiture exists because Article 8 of the Uniform Commercial Code and § 10(b) of the Securities Exchange Act of 1934 give Exodus the right to bring suit for disgorgement of profits. Without reaching the issue of whether those statutes bestow such rights on Exodus, we conclude that this argument also fails. Section 83(c)(3) provides that a substantial risk of forfeiture exists, and the property becomes nontransferable within the meaning of § 83, when a sale of the property would subject an individual to suit under § 16(b) of the Securities Exchange Act of 1934 for disgorgement of profit against certain corporate insiders. I.R.C. § 83(c). Merlo does not contend that he was an executive to which § 16(b) applied, but instead argues that, by analogy, a substantial risk of forfeiture exists whenever an employer or third party has the right to compel the disgorgement of the profits from the sale of the property.

Merlo's argument is not supported by the Code, as the only type of suit identified as subjecting property to a substantial risk of forfeiture is a suit brought under § 16(b). See § 83. For civil suits such as the ones identified by Merlo to be considered within the definition of a substantial risk of forfeiture, Congress would have to amend § 83. As the Ninth Circuit recognized when

7

considering a similar issue, "[b]y enacting I.R.C. § 83(c)(3), Congress demonstrated that civil suits are not generically covered by I.R.C. § 83 . . . . [T]his indicates that for a civil violation to be considered a substantial risk of forfeiture, Congress must act specifically to include it within the scope of I.R.C. § 83." United States v. Tuff, 469 F.3d 1249, 1256 (9th Cir. 2006). Accordingly, the tax court did not err in concluding that a substantial risk of forfeiture did not exist when Merlo exercised the option in 2000.

B. Alternative Tax Net Operating Loss

Alternatively, Merlo argues that the loss from the Exodus stock entitles him to an ATNOL deduction that he may carry back to 2000. Merlo's theory is inconsistent with the statutory scheme governing capital assets and ATNOLs.

Once Merlo exercised the option, he began holding the stock as a capital asset. See I.R.C. § 1221. When Merlo's shares of Exodus stock became worthless in 2001, he realized a capital loss for that taxable year. See I.R.C. § 165(g)(1) (providing that when a capital asset becomes worthless during the taxable year, the loss is treated as one resulting from the sale or exchange of a capital asset).

Under the regular income tax regime, a taxpayer may carry back a net operating loss ("NOL") to the two taxable years preceding the loss, then forward to the twenty taxable years following the loss. I.R.C. § 172(b)(1)(A). An NOL occurs when, in a given taxable year, the allowable deductions exceed gross income. I.R.C. § 172(c). However, in computing an NOL, noncorporate taxpayers such as Merlo may consider capital losses only to the extent of capital gains plus $3000 or the excess of losses over gains, whichever is lower. I.R.C. § 1211(b)(2); § 172(c), (d). Accordingly, § 172(d)(2)(A) works so that net capital losses are effectively excluded from the computation of NOL. 7 LEGUTKI, supra, § 29:62. And even though unrecognized capital losses may be carried

forward to subsequent taxable years, they may not be carried back to prior taxable years. I.R.C. § 1212(b).

For purposes of the AMT, taxpayers take an ATNOL deduction instead of an NOL. I.R.C. § 56(a)(4). To calculate the ATNOL deduction, the taxpayer first computes the NOL under § 172 as he would for regular income tax purposes.[3] I.R.C. § 56(d)(1); 1 LEGUTKI, supra, § 2A:01 (2004). Next the NOL is modified by taking into account the adjustments to taxable income under §§ 56 and 58 and the preference items under § 57. I.R.C. § 56(d)(2)(A). The preference items in § 57 are only considered to the extent that they increase NOL for the year for regular tax purposes. Id.

Merlo argues that § 56(d)(2)(A)(i) creates an exception to the usual rule under § 172(d) that capital losses are taken into account for NOL purposes only to the extent of capital gains.[4] But Merlo misapplies the statute. The starting

---

[3] Section 56(d)(1) provides:

> For purposes of subsection (a)(4), the term "alternative tax net operating loss deduction" means the net operating loss deduction allowable for the taxable year under section 172, except that . . .
>
> > (B) in determining the amount of such deduction—
> >
> > > (i) the net operating loss (within the meaning of section 172(c)) for any loss year shall be adjusted as provided in paragraph (2), and
> > >
> > > (ii) appropriate adjustments in the application of section 172(b)(2) shall be made to take into account the limitation of subparagraph (A).

I.R.C. § 56(d)(1).

[4] Section 56(d)(2)(A) provides:

> In the case of a loss year beginning after December 31, 1986, the net operating loss for such year under section 172(c) shall
>
> > (i) be determined with the adjustments provided in this section and section 58, and

point for the ATNOL computation is the NOL under § 172(c), (d) which accounts for capital losses and limits them to the amount of capital gain. § 56(d)(1). None of the modifications made in the second step, as directed by § 56(d)(2)(A),[5] overrides the § 172 limitations. See I.R.C. §§ 56, 57, 58. Further, the legislative history cited by Merlo is taken out of context and does not support his argument. His argument is essentially one of policy, misdirected to this court rather than to Congress. Accordingly, the tax court did not err when it determined that no ATNOL existed which could be carried back.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the tax court's judgment.

---

> (ii) be reduced by the items of tax preference determined under section 57 for such year.
>
> An item of tax preference shall be taken into account under clause (ii) only to the extent such item increased the amount of the net operating loss for the taxable year under section 172(c).

I.R.C. § 56(d)(2)(A).

[5] Secondary authority also supports our conclusion. See 1 LEGUTKI, supra § 6:70 (acknowledging that courts have repeatedly rejected taxpayers' attempts to offset AMT paid upon exercise of the option by carrying back the losses realized on the sale or disposition of the stock); Francine J. Lipaian, Incentive Stock Options and the Alternative Minimum Tax: The Worst of Times, 39 HARV. J. ON LEGIS. 337, 355 (2002) (acknowledging that under the current AMT system, a large capital loss cannot be carried back to prior taxable years).