# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANTHONY J. KADILLAK,
       *Petitioner-Appellant,*

v.

COMMISSIONER OF INTERNAL
REVENUE,
       *Respondent-Appellee.*

No. 07-70600

Tax Ct. No.
2860-04L

OPINION

Appeal from a Decision of the
United States Tax Court

Argued and Submitted
June 3, 2008—Seattle, Washington

Filed July 29, 2008

Before: Melvin Brunetti, Ronald M. Gould, and
Consuelo M. Callahan, Circuit Judges.

Opinion by Judge Brunetti

**COUNSEL**

Don Paul Badgley, Badgley-Mullins Law Group, Seattle, Washington; and Brian G. Isaacson, Merriam & Isaacson, Seattle, Washington, for the petitioner-appellant.

Francesca U. Tamami and Richard Farber, Tax Division, U.S. Department of Justice, Washington, D.C., for the respondent-appellee.

**OPINION**

BRUNETTI, Circuit Judge:

Taxpayer Anthony Kadillak appeals a tax court decision upholding the Commissioner of Internal Revenue's determinations of his income tax liabilities for tax years 2000 and 2001. The case concerns Kadillak's acquisition, and later forfeiture and sale, of vested and nonvested shares of stock through the exercise of incentive stock options ("ISOs"), and the tax consequences of those transactions, especially for purposes of the Alternative Minimum Tax ("AMT"). In denying Kadillak's petition for review, the tax court determined that Kadillak's election under I.R.C. § 83(b) to recognize AMT income on his nonvested shares in 2000 was valid; Kadillak was therefore not entitled to a claim of right deduction under I.R.C. § 1341 when his nonvested shares were later forfeited to his employer upon his termination; and because the sale of his remaining shares in 2002 did not result in any alternative

tax net operating loss ("ATNOL") under I.R.C. § 56(d)(2)(A)(i), Kadillak could not claim an ATNOL carryback deduction to reduce his AMT income for 2000. We have jurisdiction under I.R.C. § 7482(a)(1) and affirm.

## I.   FACTS & PROCEEDINGS BELOW

In April 2000, Kadillak purchased 32,000 shares of stock by exercising an ISO that had been granted to him by his employer, Ariba Technologies, Inc. Of those 32,000 shares, 17,333 were vested, and 14,667 were nonvested. The nonvested shares were subject to a vesting schedule based on length of employment. While nonvested, the shares were classified as "Restricted," held in an escrow account, and subject to Ariba's right of repurchase at the option price upon the termination of Kadillak's employment, which was "at will" and could be terminated by either party, at any time, and for any reason, with or without cause.

Although the fair market value exceeded Kadillak's option price by well over $3 million, by holding the shares rather than cashing in he avoided realizing any regular income on the transaction in 2000 because the spread on the exercise of an ISO is tax deferred under I.R.C. § 421(a)(1). Nonetheless, the transaction was not entirely non-taxable. It was subject to the Alternative Minimum Tax ("AMT"), which is imposed "separate from and in addition to the regular income tax" with the purpose of ensuring "that high-income taxpayers cannot avoid significant tax liability through the use of exclusions, deductions, and credits." *Merlo v. Comm'r*, 492 F.3d 618, 620 (5th Cir. 2007). For AMT purposes, I.R.C. § 56(b)(3) exempts ISOs from the tax deferral provision of § 421 and therefore subjects them to I.R.C. § 83, which imposes a tax on discounted property transfers in connection with the performance of services. *See Montgomery v. Comm'r*, 127 T.C. 43, 53 (2006). Thus, in 2000, Kadillak was required to report AMT income (but not regular income) on all shares that had vested by year end. *See* I.R.C. § 83(a).

In addition, Kadillak filed a voluntary election under I.R.C. § 83(b) to report AMT income in 2000 on the acquisition of his nonvested shares. Under § 83(a), the receipt of property is not yet taxable if it is "subject to a substantial risk of forfeiture." As it is undisputed that Kadillak's nonvested shares fit that definition due to his at will employment and his employer's right of repurchase upon termination, he could have waited until the shares vested to include them in AMT income. Section 83(b), however, allows a taxpayer to elect to report gross income in the year of receipt, notwithstanding the risk of forfeiture. Such an election can be advantageous if nonvested shares are expected to further appreciate before they vest, because it allows the recipient to claim taxable income while the fair market value is still relatively low and defer taxes on any appreciation until the shares are resold. But there is also a potential downside. If the risk of forfeiture later materializes, "no deduction shall be allowed in respect of such forfeiture." I.R.C. § 83(b)(1); *see Theophilos v. Comm'r*, 85 F.3d 440, 448 n.24 (9th Cir. 1996).

In this case, the strategy backfired. In 2001, Ariba terminated Kadillak's employment and exercised its right to repurchase at Kadillak's cost his remaining nonvested shares, which by that time had been reduced to 6,667 shares pursuant to the vesting schedule. Although in 2000 Kadillak had elected to realize AMT income of nearly $680,000 on those shares, by forfeiting them at his own cost in 2001 he realized no regular capital gain or loss but an AMT capital loss of the same $680,000.

In 2002, Kadillak sold his remaining 25,333 vested shares to a third party. For regular tax purposes, the sale caused him to realize a capital gain of over $60,000. For AMT purposes, however, his basis had been adjusted upward by the realization of AMT income in 2000, causing him to realize an AMT capital loss on the sale of over $2.5 million.

Kadillak originally filed his 2000 and 2001 tax returns under the assumption that his § 83(b) election was valid. For

tax year 2000, in which he exercised the ISO, he reported no regular taxable income on the transaction but an AMT capital gain of $3,262,998 on all 32,000 vested and nonvested shares. He accordingly reported AMT of $932,309, a total tax liability of $1,099,388, and a balance owing of $963,597, of which he paid only $25,000 with his return. For tax year 2001, in which he was forced to forfeit his nonvested shares, he reported no gain or loss on the forfeiture for either regular tax or AMT purposes. Kadillak's cost basis and the repurchase price were identical; and although he realized an AMT capital loss from the forfeiture, he claimed no deduction because the loss was attributable in part to his § 83(b) election. Kadillak reported zero tax liability for 2001 and, despite his outstanding liability from 2000, requested a refund of $12,720.

Rather than pay his 2000 tax liability, Kadillak pursued a different solution. He hired a tax attorney and, in 2003, filed amended returns for both tax years 2000 and 2001. The 2000 return was amended in two respects. First, he asserted that his § 83(b) election was invalid and reduced his reported AMT income accordingly by excluding any shares that were still nonvested at year end. Second, he claimed ATNOL carryback deductions based on the AMT capital losses he realized in 2001 from the forfeiture of his nonvested shares and in 2002 from the third-party sale of his vested shares. These amendments collectively nullified any AMT income in 2000 from the exercise of Kadillak's ISO, reduced his AMT liability from $932,309 to $16,712, and reduced his total tax liability from $1,099,388 to $183,524, leaving an outstanding liability of $22,733.

Kadillak further amended his 2001 return to conform to his newly amended 2000 return and his claim that he realized no AMT income on his nonvested shares in 2000 because his § 83(b) election was invalid. Whereas Kadillak's original 2001 return reported no AMT income from the exercise of his ISO, no AMT liability, and no total tax liability, his amended return reported $340,213 in AMT income for the nonvested

shares that vested in 2001, $100,845 in AMT liability, and total tax liability in the same amount, which he did not pay.

The IRS did not accept Kadillak's 2000 amended return, which would have substantially reduced his outstanding liability. It did accept his 2001 amended return, however, which substantially increased his reported liability for that year. The IRS then issued a notice of federal tax lien for 2000 and a notice of intent to levy for 2001.

After exhausting his administrative remedies, Kadillak filed the underlying tax court petition challenging the lien and levy. Rather than defending both, the Commissioner immediately conceded that the tax assessments for 2000 and 2001 were inconsistent and took the position that Kadillak's original returns had both correctly reported his respective tax liabilities. If the court agreed, the Commissioner would abate the $100,845 tax assessment for 2001, which Kadillak had reported on his amended return only on the assumption that the § 83(b) election in 2000 was invalid and the 2000 amendments were correct.

Although he accepted the Commissioner's concession, Kadillak defended his amended returns. In two motions for partial summary judgment, he contended, among other things, that (1) the § 83(b) election was invalid; (2) even if the election were valid, he was entitled to a "claim of right" deduction under I.R.C. § 1341 from the 2001 forfeiture of his nonvested shares; and (3) he was entitled to an ATNOL carryback deduction in 2000 based on the AMT capital losses he sustained on the forfeiture of his nonvested shares in 2001 and on the third-party sale of his vested shares in 2002.

Rejecting each of those arguments, the tax court denied Kadillak's motions and granted summary judgment for the Commissioner. We review *de novo* the tax court's decisions on summary judgment, including its interpretations of the tax code and accompanying regulations. *Gladden v. Comm'r*, 262

F.3d 851, 853 (9th Cir. 2001); *UnionBanCal Corp. v. Comm'r*, 305 F.3d 976, 981 (9th Cir. 2002).

## II.   SECTION 83(b) ELECTION

In the tax court, Kadillak advanced multiple theories in support of his contention that his § 83(b) election in 2000 was invalid, such that he was not required to immediately recognize AMT income on his nonvested shares. He now relies on just one: He was unable to make a valid election under § 83 because his acquisition of the nonvested shares through the exercise of his ISO was not a transfer of "property" within the meaning of I.R.C. § 83 and Treasury Regulation § 1.83-3(e). Kadillak does not take issue with the tax court's reasoning that the benefits he received upon acquiring the nonvested shares, including his acquisition of all stockholder rights and his entitlement to receive all regular dividends, constituted a "beneficial interest" under I.R.C. § 83. Instead, he points out that a beneficial interest in assets is not alone sufficient; for such a beneficial interest to be "property," the assets also must have been "transferred or set aside from the claims of creditors of the transferor." Treas. Reg. § 1.83-3(e).[1]

In that regard, Kadillak argues that merely depositing his nonvested shares into an escrow account did not adequately protect them from the claims of his employer's creditors. He speculates that if Ariba had filed for bankruptcy, its creditors could have forced it to terminate Kadillak's at-will employment and exercise its right to repurchase his nonvested shares at cost. He further likens an escrow account to a "rabbi trust"[2]

---

[1]The regulation states, in pertinent part: "For purposes of section 83 and the regulations thereunder, the term 'property' includes real and personal property other than either money or an unfunded and unsecured promise to pay money or property in the future. The term also includes a beneficial interest in assets (including money) which are transferred or set aside from the claims of creditors of the transferor, for example, in a trust or escrow account." Treas. Reg. § 1.83-3(e).

[2]A rabbi trust is a commonly-used mechanism for deferred compensation and deferred taxation, in which "[f]unds held by the trust are out of

and argues that the doctrine of constructive receipt does not require the recognition of income under § 83 where deferred compensation is subject to substantial limitations or restrictions, including the claims of the creditors of the corporation.

**[1]** We have no quarrel with Kadillak's hypothesis. Given the terms of Kadillak's employment contract and the Ariba stock plan, it is conceivable that the creditors of a bankrupt Ariba could force it to terminate Kadillak and then repurchase his nonvested shares at cost. But Kadillak misses the point, as the scenario he envisions only incidentally involves the claims of Ariba's creditors. The real culprits are Ariba's rights of termination and repurchase, which Ariba could exercise of its own accord, at any time and for any reason, regardless of any financial difficulty or pressure from creditors. Viewed in that light, Kadillak's hypothesis demonstrates nothing more than that his nonvested shares were "subject to a substantial risk of forfeiture" and therefore would be ordinarily excluded from income under I.R.C. § 83(a), not that they were outside the scope of § 83 altogether. As the very purpose of a taxpayer's § 83(b) election is to realize income on assets that otherwise would not be included in income under § 83(a) due to a substantial risk of forfeiture, the mere fact that an asset is subject to a substantial risk of forfeiture is no justification either for excluding it from the definition of "property" and the coverage of § 83, or for invalidating an otherwise valid § 83(b) election.

**[2]** Also without merit is Kadillak's suggestion that, even aside from Ariba's right of repurchase, depositing the nonvested shares into an escrow account was insufficient to satisfy Treasury Regulation § 1.83-3(e). Despite Kadillak's manifest and repeated misquotations of the regulation in his

reach of the employer, but are subject to the claims of the employer's creditors in the event of bankruptcy or insolvency." *In re IT Group, Inc.*, 448 F.3d 661, 665 (3d Cir. 2006).

briefs, the regulation quite plainly enumerates "a trust or escrow account" as the prototypical vehicles for "transferr-[ing] or set[ting] aside [assets] from the claims of creditors." *Id.* Moreover, even if Kadillak might be correct that certain types of trusts or escrow accounts could fail to satisfy the regulatory requirements, because he has provided no evidence that the escrow account used by Ariba was, in fact, inadequate to protect his shares from Ariba's creditors, we have no reason to depart from the general rule in this case.

**[3]** Because Kadillak's nonvested shares were "property" within the coverage of I.R.C. § 83 and Treasury Regulation § 1.83-3(e), he was fully capable of making a § 83(b) election to recognize income on the shares in the year of receipt, notwithstanding the substantial risk of forfeiture. As we are presented with no other reason for invalidating the election, we conclude that it was valid and that Kadillak was accordingly required to report AMT income on his nonvested shares, as he did on his original 2000 tax return.

## III.   CLAIM OF RIGHT DEDUCTION

Kadillak next contends that, even if the § 83(b) election is valid, he was entitled to a "claim of right" deduction under I.R.C. § 1341 because the nonvested shares that were includable in AMT income in 2000 were forfeited in 2001 at an AMT capital loss.

He again misapplies the tax code. Section 1341(a) indeed permits taxpayers to compute their tax differently where they reported income on the receipt of property in one tax year and then forfeited that property in a later tax year. But the statute applies only if "*a deduction is allowable* for the taxable year because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item or to a portion of such item," among other requirements. I.R.C. § 1341(a)(2) (emphasis added). As clarified in the accompanying regulation, the deduction must be

allowable "under other provisions" of the tax code. Treas. Reg. § 1.1341(a)(1).

**[4]** In this case, Kadillak fails to satisfy § 1341(a)(2) because the flush language of § 83(b)(1) expressly disallows any deduction respecting the forfeiture of his nonvested shares that were subject to his valid § 83(b) election. The statute plainly states: "If such election is made, . . . and if such property is subsequently forfeited, no deduction shall be allowed in respect of such forfeiture." I.R.C. § 83(b)(1).

**[5]** Kadillak therefore could not claim any deduction from the forfeiture of his nonvested shares in 2001. Besides being ineligible for a "claim of right" deduction under I.R.C § 1341, his deduction was also limited under Treasury Regulation § 1.83 2(a) to the excess, if any, of the amount paid for the shares over the amount realized upon the forfeiture. Of course, as Ariba repurchased the shares at cost, there was no excess and therefore no deduction.

## IV.   ATNOL CARRYBACK DEDUCTION

Kadillak finally attempts to reduce his 2000 tax liability by claiming the AMT capital losses he sustained in 2001 and 2002 as ATNOL deductions and then carrying back those deductions to 2000. Because the § 83(b) election was valid, Kadillak realized an AMT capital loss of nearly $680,000 on the forfeiture of his nonvested shares in 2001, and he realized an AMT capital loss of over $2.5 million on the resale of his vested shares in 2002. In order to claim those losses as ATNOLs, he reads I.R.C. § 56 as establishing a "sequential formula" that allows him to fully deduct his AMT capital loss as an ATNOL under I.R.C. § 56(d)(2)(A)(i), notwithstanding the limitations on capital loss deductions in I.R.C. §§ 172(d) and 1211(b).

**[6]** Once again, Kadillak misapplies the tax code. Section 56 indeed provides that the ATNOL deduction "shall be

allowed in lieu of the net operating loss deduction allowed [for regular tax purposes] under section 172." I.R.C. § 56(a)(4). But the statute hardly exempts ATNOL from the limitations of § 172. Quite the contrary, § 56 goes on to define ATNOL by expressly incorporating the definition of regular NOL in § 172 and then enumerating specific exceptions, none of which allow a taxpayer to avoid the capital loss limitations in § 172(d) or § 1211(b). *See* I.R.C. § 56(d)(1) ("For purposes of subsection (a)(4), the term "alternative tax net operating loss deduction" means the net operating loss deduction allowable for the taxable year under section 172, except that . . ."); *Merlo*, 492 F.3d at 623-24.

At issue here is the exception in § 56(d)(1)(B)(i), which provides that in computing the ATNOL deduction, the NOL under § 172(c) "shall be adjusted as provided in paragraph (2)." In turn, § 56(d)(2) provides:

> (2) Adjustments to net operating loss computation.
>
>> (A) Post-1986 loss years. In the case of a loss year beginning after December 31, 1986, the net operating loss for such year under section 172(c) shall
>>
>>> (i) be determined with the adjustments provided in this section [56] and section 58, and
>>>
>>> (ii) be reduced by the items of tax preference determined under section 57 for such year.
>>
>> An item of tax preference shall be taken into account under clause (ii) only to the extent such item increased the amount of the net operating loss for the taxable year under section 172(c).

I.R.C. § 56(d)(2)(A). In other words, the ATNOL deduction under § 56(d) is determined by first computing NOL under § 172(c) "with the adjustments" provided in §§ 56 and 58, and then subtracting tax preference items determined under § 57.

**[7]** In this case, Kadillak seeks to take advantage of the incentive stock option adjustment in § 56(b)(3), which, along with the § 83(b) election, was responsible for his realization of AMT income on the acquisition of his vested and non-vested shares in 2000 and, correspondingly, his realization of AMT capital losses from the dispositions in 2001 and 2002. The problem, however, is that § 172(c) does not allow him to deduct his net capital losses as an NOL. Section 172(c) directs that NOL "shall be computed with the modifications specified in subsection (d)." And subsection (d) in turn provides that "the amount deductible on account of losses from sales or exchanges of capital assets shall not exceed the amount includable on account of gains from sales or exchanges of capital assets." I.R.C. § 172(d)(2)(A). "Accordingly, § 172(d)(2)(A) works so that net capital losses are effectively excluded from the computation of NOL." *Merlo*, 492 F.3d at 623.

Kadillak may still be able to use his AMT capital losses to adjust his AMT income; however, because he cannot claim such losses as ATNOLs under § 56(a)(4) and (d)(2), his only option is to claim them under § 56(b)(3) as direct adjustments to AMT income. Moreover, even when claimed in that manner, his AMT capital loss deductions are limited by other provisions. For tax year 2001, Kadillak is prohibited under § 83(b)(1) from taking any deduction in respect of the forfeiture of his nonvested shares that were subject to his valid § 83(b) election. And for 2002, Kadillak's AMT capital loss deduction in respect of the sale of his vested shares is subject to the $3,000 excess capital loss limitation in § 1211(b). *See Merlo*, 492 F.3d at 623.

**[8]** Kadillak attempts to avoid the restrictions of § 172(d) and § 1211(b) by reading § 56(d) as establishing a different

"sequential formula" for computing ATNOL than the formula provided in § 172(c) for computing regular NOL. Specifically, he reads § 56(d)(1)(B)(i) as requiring that a taxpayer compute ATNOL by first calculating NOL under § 172(c) while fully taking into account the limitations of § 172(d) and § 1211(b), and *then* making the adjustments "provided in paragraph (2)" of § 56(d). I.R.C. § 56(d)(1)(B)(i). However, the statutory text belies that reading. First, rather than altering the § 172 formula, § 56(d)(1) expressly defines the ATNOL deduction as "the net operating loss deduction allowable . . . under section 172," subject to only certain exceptions. Thus, § 56(d)(1) generally incorporates the § 172 formula, including any limitations on allowance of deductions; and the statute thereby disallows any deduction that is disallowed by § 172(c) and not specifically allowed by an exception in § 56(d). Second, paragraph (2) of § 56(d) contradicts Kadillak's contention that paragraph (1)'s reference to paragraph (2) establishes a sequence distinct from the § 172 formula. Paragraph (2) actually provides that, for purposes of computing ATNOL, the NOL "under section 172(c) shall . . . be determined *with* the adjustments provided in this section [56] and section 58." I.R.C. § 56(d)(2)(A)(i) (emphasis added). In other words, rather than directing taxpayers to determine ATNOL by calculating NOL under § 172(c) *before* making the AMT adjustments in §§ 56 and 58, § 56(d) actually directs taxpayers to calculate NOL under § 172(c) *with* AMT-adjusted figures.

We also reject Kadillak's contention that the flush language of § 56(d)(2)(A) supports his interpretation. It states: "An item of tax preference shall be taken into account under clause (ii) [of § 56(d)(2)(A)] only to the extent such item increased the amount of the net operating loss for the taxable year under section 172(c)." I.R.C. § 56(d)(2)(A). Because the flush language expressly applies only to the § 57 adjustments in clause (ii), and not the § 56 adjustments in clause (i), it has no bearing on Kadillak's ability (or inability) to claim his AMT capital losses as an ATNOL under clause (i).

**[9]** We therefore join with the Fifth Circuit in holding that an individual taxpayer's AMT capital losses are subject to the limitations in I.R.C. §§ 172(d) and 1211(b) and therefore are not deductible as an ATNOL under I.R.C. § 56(d)(2)(A)(i). *Merlo*, 492 F.3d at 623-24. Accordingly, the tax court did not err when it determined that no ATNOLs existed in 2001 and 2002 that could be carried back. *See id.* at 624.

## V.    CONCLUSION

The tax court's decision denying Kadillak's motions for summary judgment and granting summary judgment in favor of the Commissioner is

**AFFIRMED.**