**MAXIM GROUP LLC, Plaintiff,**

v.

**LIFE PARTNERS HOLDINGS, INC., Defendant.**

No. 07 Civ. 8099(LAP).

United States District Court, S.D. New York.

Feb. 11, 2010.

Richard Johnnie Babnick, Jr., Sichenzia Ross Friedman Ference, LLP, New York, NY, for Plaintiff.

Andrew James Frisch, LeClairryan, Norfolk, VA, Michael Terrance Conway, LeClairryan, New York, NY, for Defendant.

## MEMORANDUM AND ORDER

LORETTA A. PRESKA, Chief Judge.

Plaintiff Maxim Group LLC ("Maxim"), an investment banking firm, brings this action alleging that Defendant Life Partners Holdings, Inc. ("LPHI") breached the parties' contract by failing to deliver 100,-000 shares of LPHI's common stock to Maxim pursuant to a stock warrant. LPHI filed counterclaims alleging that Maxim breached the agreement by failing to provide any of the services set forth in the agreement and that Maxim fraudulently induced LPHI to enter into the agreement. LPHI now moves for partial summary judgment confirming that if LPHI is found to have breached the agreement, then the breach occurred when the agreement was executed and any resulting damages should be calculated from that date. LPHI further moves to dismiss Maxim's claim for specific performance of the agreement. Maxim cross-moves for summary judgment on its claim for breach of contract and for dismissal of LPHI's counterclaims and affirmative defenses.

For the reasons set forth below, LPHI's motion for partial summary judgment [dkt. no. 35] is granted in part and denied in part, and Maxim's cross-motion for summary judgment [dkt. no. 40] is granted in part and denied in part.

## I. BACKGROUND[1]

### A. The Agreement

On October 28, 2004, Maxim, an investment banking, securities, and investment

1. The following facts are taken from: the Second Amended Complaint ("Compl."); the Answer to Second Amended Complaint with Counterclaims ("Counterclaims"); LPHI's Statement of Undisputed Material Facts by Defendant Pursuant to Local Rule 56.1 ("LPHI 56.1"); the Declaration of R. Scott Peden in Support of Motion for Partial Summary Judgment and the exhibits attached thereto ("Peden Decl.") the Declaration of Michael T. Conway in Support of Motion for Partial Summary Judgment and the exhibits attached thereto ("Conway Decl."); Maxim's Statement of Undisputed Material Facts Pursuant to L.R. 56.1 ("Maxim 56.1"); the Declaration of Richard J. Babnick Jr. in Opposition to Defendant's Partial–Summary–Judgment Motion and in Support of Plaintiff's Cross–Motion for Summary Judgment and the exhibits attached thereto ("Babnick Decl."); LPHI's Response to Plaintiff's Statement of Undisputed Material Facts Submitted in Support of Cross–Motion Pursuant to Local Rule 56.1 ("LPHI Resp. 56.1"); the Declaration of R. Scott Peden in Opposition to Cross–Motion for Summary Judgment ("Peden Opp. Decl."); the Declaration of Michael T. Conway in Further Support of Partial Summary Judgment and in Opposition to Cross–Motion for Summary Judgment and the exhibits attached thereto ("Conway Opp. Decl."); and the Declaration of Richard J. Babnick Jr. in

firm, and LPHI, a publicly traded company that specializes in the purchase and resale of life insurance policies, entered into a letter agreement (the "Agreement") whereby Maxim was to provide various advisory and investment banking services in exchange for fees and stock warrants. (LPHI 56.1 ¶ 1; Maxim 56.1 ¶ 1; Peden Decl., Ex. A (the "Agreement").) Pursuant to the terms of the Agreement, Maxim was to provide:

[G]eneral financial advisory and investment banking services ... [and] shall (i) familiarize itself, to the extent appropriate and feasible, with the business, operations, properties, financial condition, management and prospects of the Company; (ii) advise the Company on matters relating to its capitalization; (iii) evaluate alternative financing structures and arrangements; (iv) assist the Company in developing appropriate acquisition criteria and identifying target industries; (v) assist the Company in evaluating and make recommendations concerning the relationships among the Company's various lines of business and potential areas for business growth; (vi) provide such other financial advisory and investment banking services upon which the parties may mutually agree.

(Agreement § 1.) In consideration for Maxim's services, LPHI agreed to pay Maxim the following:

(i) a non-refundable cash fee of $25,000 payable upon execution of this Agreement ("Initial Advisory Fee") and (ii) The Company shall grant to Maxim a warrant ("Warrant") to purchase 100,-000 shares of the Company's common stock. The Warrant shall be exercisable at any time during the five-year period commencing on the date hereof at an exercise price of $7.00 per share. The Warrant shall provide for immediate registration at the optionee's expense as well as other provisions, including, without limitation, those pertaining to cashless exercise, antidilution protection and piggyback registration rights, contained in the Warrant certificates delivered to the Company together with this Agreement.

(*Id.* § 3(a).) The term of the Agreement was six months "after which time [the Agreement would] continue on a month to month basis during which either Maxim or LPHI may terminate [the Agreement] at any time upon 30 days' prior written notice to the other party." (*Id.* § 8.) Although no written notice was delivered by either Maxim or LPHI, the relationship appeared to end around April or May 2005. (Maxim 56.1 ¶ 38.)

LPHI alleges that prior to the execution of the Agreement, Andrew Scott ("Scott"), an investment banker with Maxim, induced LPHI to enter into the Agreement by representing that Maxim would arrange a debt facility of between $20 and $50 million which LPHI could use to purchase life insurance policies for ultimate resale on the national market. (LPHI 56.1 ¶ 3.) Maxim, on the other hand, contends that no such representations were made and that all of Maxim's services were listed in the Agreement. (Maxim 56.1 ¶ 3.) After the Agreement was executed, LPHI paid Maxim the $25,000 fee, but both parties agree that the Warrant was never delivered; Maxim believed it had the Warrant in-house, but when it tried to exercise its right to purchase stocks, it realized that the Warrant was not in its possession. (LPHI 56.1 ¶ 6; Maxim 56.1 ¶ 6.)

Further Support of Plaintiff's Cross–Motion for Summary Judgment and the exhibits attached thereto ("Babnick Reply Decl.").

## B. *Maxim's Performance*

According to LPHI, Maxim failed to perform any of the services set forth in the Agreement. (Peden Opp. Decl. ¶¶ 16–22.) To support these claims, LPHI points to the depositions of Scott, Armand Pastine ("Pastine"), and Christopher Fiore ("Fiore"). In his deposition, Scott testified that he familiarized himself with LPHI and spent time learning the life settlement industry. (Conway Opp. Decl., Ex. H at 128:3–16.) In January 2005, LPHI released its fourth quarter earnings which were below Maxim's analysts' expectations. (*Id.* at 128:17–24.) Due to the lower earnings, Scott "deemed it necessary that [Maxim] needed a quote/unquote cooling off period until we could revisit the institutions again." (*Id.* at 129:9–12.) By institutions, Scott was referring to the various financial groups that were potential investors in LPHI. After January 2005, Scott claimed that efforts were made to generate interest on the investment fund side, but nothing came to fruition. When asked whether he personally made calls to potential investors, Scott testified that he called Wasatch, and that Pastine and Fiore made other calls. (*Id.* at 131:4–22.) Finally, Scott testified that Pastine tried to contact other funds and that Fiore was responsible for setting up road show meetings and getting involved if a fund had been launched. (*Id.* at 231:5–25.)

In his deposition, Pastine testified that he participated in a meeting and provided input relating to the "viability of the securitization as an alternative strategy to acquire the assets and to sell them to investors...." (Conway Opp. Decl., Ex. I at 12:18–13:9.) When asked whether he had any other input in the advisory agreement between Maxim and LPHI, Pastine answered that he did not. (*Id.* at 15:5–8.) Finally, Fiore testified that he had no knowledge of the transaction described in the Agreement between Maxim and LPHI. (Conway Opp. Decl., Ex. J at 20:22–25.)

## C. *LPHI's Refusal to Tender the Shares*

On September 6, 2007, Maxim's General Counsel, Ed Rose ("Rose"), contacted Scott Peden ("Peden"), LPHI's Corporate Secretary and President and General Counsel of Life Partners, Inc., and informed Peden that Maxim wished to exercise the Warrant through a cashless exercise. (Maxim 56.1 ¶ 43.) At the time, both Rose and Scott believed Maxim possessed the Warrant, but when they discovered that the Warrant was not delivered by LPHI, Rose requested that LPHI deliver a new Warrant certificate. (*Id.*; Babnick Decl., Ex. 13.) Brian Pardo ("Pardo"), LPHI's President and Chairman of the Board, responded to Rose's request by informing Rose that if the Warrant was not delivered, the strike price was $7 per share. (Maxim 56.1 ¶ 44; Babnick Decl., Ex. 13.) On September 11, 2007, LPHI, through Pardo, refused to deliver the Warrant citing "inconsistencies in [the Agreement] and prior relationship." (Babnick Decl., Ex. 14.) In his deposition, Pardo identified the inconsistencies to be that Maxim "didn't earn the warrants." (Babnick Decl., Ex. 3 at 101:20–25.)

## II. *LPHI'S MOTION FOR PARTIAL SUMMARY JUDGMENT*

### A. *Summary Judgment Standard*

A moving party is entitled to summary judgment only "if the pleadings, depositions, answers to interrogatories, and the admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that [the party is] entitled to judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P.

56(c)). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.; see also Overton v. N.Y. State Div. of Military and Naval Affairs*, 373 F.3d 83, 89 (2d Cir.2004).

In assessing whether summary judgment is proper, the Court construes the evidence in the light most favorable to the non-moving party. *Lucente v. IBM Corp.*, 310 F.3d 243, 253 (2d Cir.2002). Here, because each party is moving for summary judgment, the moving party bears the initial burden of providing the basis for the motion and of identifying the evidentiary materials, if any, supporting the moving party's position. *See Grady v. Affiliated Cent., Inc.*, 130 F.3d 553, 559 (2d Cir.1997). The non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (quoting Fed. R.Civ.P. 56(e)). Mere speculation and conjecture will not suffice. *See Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir.2003).

## B. *Date of Breach of the Agreement*

■ LPHI's motion for partial summary judgment seeks an order fixing the date of LPHI's alleged breach of the Agreement as October 28, 2004—the execution date of the Agreement—and that any damages should be measured from that date. "Although the amount of recoverable damages is a question of fact, 'the measure of damages upon which the factual computation is based is a question of law.'" *Wolff & Munier, Inc. v. Whiting–Turner Contracting Co.*, 946 F.2d 1003, 1009 (2d Cir.1991) (quoting *United States ex rel. N. Maltese & Sons, Inc. v. Juno Constr. Corp.*, 759 F.2d 253, 255 (2d Cir.1985)). Assuming a breach occurred, the date of breach is September 11, 2007, the date LPHI refused to deliver the shares of stock, and any damages should be measured from that date.

■ "It is settled Second Circuit law that in a breach of contract case, damages are calculated at the time of the breach." *Boyce v. Soundview Tech. Group, Inc.*, 464 F.3d 376, 384 (2d Cir.2006); *see also Simon v. Electrospace Corp.*, 28 N.Y.2d 136, 145, 320 N.Y.S.2d 225, 269 N.E.2d 21 (1971) ("The proper measure of damages for breach of contract is determined by the loss sustained or gain prevented at the time and place of breach.").[2] This rule applies equally to cases where the alleged breach involves the failure by one party to deliver shares of stock to the other party. *See Simon*, 28 N.Y.2d at 145, 320 N.Y.S.2d 225, 269 N.E.2d 21 ("The rule is precisely the same when the breach of contract is nondelivery of shares of stock.") (citations omitted); *see also Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Americas*, 618 F.Supp.2d 280, 293 (S.D.N.Y.2009) ("[T]he most obvious date on which Aristocrat breached the Indenture is when Aristocrat refused to deliver the shares to the Bondholders after the Bondholders completed the necessary steps to convert their bonds."); *Hermanowski v. Acton Corp.*, 580 F.Supp. 140, 143–44 (E.D.N.Y.1983) (finding that the date of breach was the date defendant rejected plaintiff's exercise of his stock options), *aff'd*, 729 F.2d 921,

---

**2.** The Agreement sets forth that it "shall be governed by and construed in accordance with the laws of the State of New York applicable to agreements made and to be fully performed therein, without regard to conflicts of law principles." (Agreement § 10.)

922 (2d Cir.1984) (affirming district court's determination of the date of breach).

In support of its argument that the date of breach should be October 28, 2004, LPHI primarily relies on the Court of Appeals' decision in *Oscar Gruss & Son, Inc. v. Hollander*, 337 F.3d 186 (2d Cir. 2003). In *Oscar Gruss*, plaintiff provided financial advisory services to defendant in connection with defendant's attempts to acquire a controlling interest of a company. *Id.* at 189–90. As consideration for plaintiff's services, defendant compensated plaintiff with a $50,000 retainer and warrants, "which [vested] immediately upon the signing of the agreement," to acquire 25,000 shares of the company's common stock held by defendant. *Id.* at 190. The agreement was executed on February 3, 1997, but defendant failed to deliver the warrants. *Id.* Plaintiff knew of this breach immediately and demanded that defendant tender the warrants, which defendant refused. *Id.* Two years later, another company made a tender offer for the company's shares. *Id.* at 191. Plaintiff demanded damages as of the date of the tender offer, and the district court awarded plaintiff damages in that amount. *Id.* The Court of Appeals reversed the district court's finding and held that damages were to be calculated from the date defendant refused to deliver the warrants. *Id.* at 196. In arriving at this decision, the Court of Appeals adhered to the well-settled rule that "breach of contract damages are measured from the date of the breach," which the Court determined had occurred when defendant refused to deliver the warrants. *Id.* at 196 (citing *Simon,* 28 N.Y.2d at 145, 320 N.Y.S.2d 225, 269 N.E.2d 21). Here, LPHI argues that because failure to deliver the warrants was deemed the date of breach in *Oscar Gruss,* the same rule should be applied here. This is not so. *Oscar Gruss* is distinguish-able from the instant case in several respects.

Unlike the plaintiff in *Oscar Gruss,* who had notice of the breach almost immediately after the contract was signed, Maxim was not aware of LPHI's failure to deliver the Warrant until September 2007, almost three years after the execution of the Agreement. (*See* Babnick Decl., Exs. 13, 14 (email correspondence regarding Maxim's desire to purchase shares pursuant to the Warrant and LPHI's refusal).) In *Oscar Gruss,* the plaintiff brought suit for breach of contract after defendant's refusal to deliver the warrant and prior to the tender offer; the issue of plaintiff's damages (and the district court's improper damages analysis) did not take place until after the tender offer was made. *See Oscar Gruss,* 337 F.3d at 190–91.

Here, no such ambiguity as to the date of breach exists, and the Court is not faced with the prospect of engaging in speculation as to when Maxim would sell the stock at some future date. *See, e.g., Waxman v. Envipco Pickup & Processing Servs.,* No. 02 Civ. 10132, 2006 WL 1788964, at *3 (S.D.N.Y. June 28, 2006) (reasoning that by valuing depository receipts, which were tradeable securities representing stock, "as of the date when [defendant] failed to deliver [the receipts] reflects the true loss to plaintiffs at the time of breach, and eliminates any speculation concerning how long plaintiffs would have held on to the securities if they had been delivered as promised"). First, even though the Warrant was not delivered to Maxim, the documents show that such failure was not material to the Agreement. When Rose informed LPHI that Maxim did not possess the Warrant, Pardo (LPHI's Chairman) indicated that "if the warrants were not delivered pursuant to a proper reading of the agreement the

strike price is $7 per share." [3] (Babnick Decl., Ex. 13.) Indeed, because the Agreement sets forth the material terms of the Warrant (which included the exercise price, the duration of the Warrant, Maxim's cashless exercise option, and the piggyback registration rights), the actual possession of the Warrant appears to be nothing more than a formality. Moreover, nothing in the Agreement suggests that the time to deliver the Warrant was of the essence which would not make LPHI's failure to deliver the Warrant a material breach as of October 24, 2004. *See, e.g., Denker v. Twentieth Century–Fox Film Corp.,* 26 Misc.2d 1035, 210 N.Y.S.2d 241, 244 (N.Y.Sup.Ct.1960) ("Generally speaking, time is not of the essence, in agreements in which no serious prejudices can result from delay."). No prejudice resulted here because the Agreement contained the material terms of the Warrant.

Because Maxim sought to exercise the Warrant on September 6, 2007, and that request was denied on September 11, 2007, the date from which damages will be measured will be, pursuant to the well-settled rule in this Circuit, the date of refusal, September 11, 2007. *See Hermanowski v. Acton Corp.,* 729 F.2d 921 (2d Cir.1984) (per curiam) (setting the damages as the date of breach the date on which plaintiff attempted to exercise his stock option); *Commonwealth Assocs. v. Palomar Med. Tech., Inc.,* 982 F.Supp. 205, 208 (S.D.N.Y. 1997) (finding that breach occurred not when defendant failed to issue warrants, but when defendants refused "to honor the demand of [plaintiff]"). Accordingly, LPHI's motion for partial summary judgment is denied.

## C. *Measure of Damages*

■ Under New York law, "it is appropriate to assess damages for breach of contract based on a failure to issue a warrant or a failure to honor a warrant by comparing the warrant's strike price to the market price of the stock on the date of attempted exercise." *Remsen Funding Corp. of N.Y. v. Ocean W. Holding Corp.,* No. 06 Civ. 15265, 2009 WL 874212, at *1 (S.D.N.Y. Mar. 31, 2009) (citing *Hermanowski,* 729 F.2d at 922); *accord Lucente v. IBM Corp.,* 310 F.3d 243, 262 (2d Cir. 2002); *Kinsey v. Cendant Corp.,* 04 Civ. 582, 2008 WL 5057408, at *4 (S.D.N.Y. Nov. 26, 2008); *Onanuga v. Pfizer, Inc.,* 03 Civ. 5405, 2003 WL 22670842, at *5 (S.D.N.Y. Nov. 7, 2003); *see also Boyce v. Soundview Tech. Group, Inc.,* 464 F.3d 376, 385 (2d Cir.2006) (" '[T]he measure of damages is the difference between the option price and the market value of the stock ....' " (quoting *Hermanowski v. Acton Corp.,* 580 F.Supp. 140, 146 (E.D.N.Y. 1983))).

■ Here, because we are dealing with a publicly traded stock, to determine the stock's value on the date of breach, we use "the mean between the highest and lowest quoted selling prices," as provided by the public exchange upon which the stock traded. *United States v. Cartwright,* 411 U.S. 546, 551, 93 S.Ct. 1713, 36 L.Ed.2d 528 (1973); *see Boyce v. Soundview Tech. Group, Inc.,* 464 F.3d 376, 385 (2d Cir. 2006) (same); Treas, Reg. § 20.2031–2, 26 C.F.R. § 20.2031–2(b)(1) ("[I]f there is a market for stocks or bonds, on a stock exchange, in an over-the-counter market, or otherwise, the mean between the highest and lowest quoted selling prices on the

---

**3.** It should be noted that because the Agreement expressly provided that "any waiver must be in writing" (Agreement § 15), Pardo's response cannot be construed as a waiver, but it suggests that the failure to deliver the Warrant was not a material breach of the Agreement.

valuation date is the fair market value per share or bond.").

■ On September 11, 2007, LPHI's common stock reached a high of $47.58 per share and a low of $45.73 per share. (Babnick Decl., Ex. 15.) Therefore, the mean of LPHI's stock price was $46.66 per share. (*Id.*) As set forth in the Agreement, Maxim could use a cashless exercise option to acquire the 100,000 shares at $7 per share. (Agreement § 3(a).) Therefore, Maxim's Warrant to acquire 100,000 shares had an intrinsic value of $3,966,000 ((100,000 × $46.66)-(100,000 × $7)). Because a question of fact remains as to whether Maxim breached the Agreement by failing to perform any of the services set forth in the Agreement (*see infra* III. A), whether, and to what extent, Maxim is entitled to damages will be left to the jury. *See Wolff & Munier, Inc. v. Whiting–Turner Contracting Co.*, 946 F.2d 1003, 1009 (2d Cir.1991) ("[T]he amount of recoverable damages is a question of fact . . . .").

### D. *Specific Performance*

■ In order for a party to obtain the equitable remedy of specific performance, it "must demonstrate that remedies at law are incomplete and inadequate to accomplish substantial justice." *Lucente*, 310 F.3d at 262; *see also Leasco Corp. v. Taussig*, 473 F.2d 777, 786 (2d Cir.1972) (same). In the case of publicly traded stock, specific performance is not appropriate because there is no reason why money damages would not adequately compensate Maxim for LPHI's breach. *Lucente*, 310 F.3d at 262; *see Simon*, 28 N.Y.2d at 145, 320 N.Y.S.2d 225, 269 N.E.2d 21. Accordingly, LPHI's motion for partial summary

judgment dismissing Maxim's claim for specific performance is granted.

### III. *MAXIM'S CROSS–MOTION FOR SUMMARY JUDGMENT*

#### A. *Maxim's Breach of Contract Claim*

■ Maxim cross-moves for summary judgment on its claim for breach of contract and also seeks dismissal of LPHI's counterclaim and affirmative defense of breach of contract. To make out a viable claim for breach of contract, Maxim "need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the plaintiff, (3) breach of contract by the defendant, and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir.1996). There is no question that an agreement existed, that LPHI refused to deliver the shares of common stock, and that Maxim was damaged as a result of LPHI's breach. The only remaining question is whether Maxim performed its duties set forth in § 1 of the Agreement. LPHI has asserted as both a counterclaim and an affirmative defense that Maxim materially breached the Agreement by, *inter alia*, failing to create a credit facility or warehouse facility for LPHI and failing to perform any of the tasks set forth in § 1 of the Agreement.[4] Maxim's material breach, LPHI argues, relieves LPHI of its obligations under the Agreement. *See Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007) ("Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach.") (citing *Hadden v. Consol. Edison Co. of N.Y.*, 34 N.Y.2d 88, 96, 356 N.Y.S.2d 249, 312 N.E.2d 445

---

**4.** LPHI also argues that a question of fact exists as to whether the Warrant was intended to be "performance-based" or "success-

based." This argument is discussed in III.C.i, *infra.*

(1974)). The Court will address each of LPHI's allegations in turn.

### i. *Failure to Create Credit/Warehouse Facilities*

 According to the terms of the Agreement, Maxim was to provide the following services:

> [G]eneral financial advisory and investment banking services . . . [and] shall (i) familiarize itself, to the extent appropriate and feasible, with the business, operations, properties, financial condition, management and prospects of the Company; (ii) advise the Company on matters relating to its capitalization; (iii) evaluate alternative financing structures and arrangements; (iv) assist the Company in developing appropriate acquisition criteria and identifying target industries; (v) assist the Company in evaluating and make recommendations concerning the relationships among the Company's various lines of business and potential areas for business growth; (vi) provide such other financial advisory and investment banking services upon which the parties may mutually agree.

(Agreement § 1.) In its Counterclaims and opposition brief, however, LPHI argues that Maxim was "to create a 'credit facility' or 'warehouse facility' with which to buy and sell life insurance policies" and that the creation of the fund was characterized in the Agreement as "providing 'general financial advisory and investment banking services' to [LPHI]." (Counterclaims ¶¶ 8–9.) LPHI argues that the Agreement is ambiguous and that a question of fact exists as to whether the contractual term "general financial advisory and investment banking services" required Maxim to create a credit/warehouse facility. The Court finds that it does not.

 Under New York law, "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Greenfield v. Philles Records, Inc.,* 98 N.Y.2d 562, 569, 750 N.Y.S.2d 565, 780 N.E.2d 166 (2002). "Typically, the best evidence of intent is the contract itself; if an agreement is 'complete, clear and unambiguous on its face [, it] must be enforced according to the plain meaning of its terms.'" *Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.,* 375 F.3d 168, 177 (2d Cir.2004) (quoting *Greenfield,* 98 N.Y.2d at 569, 750 N.Y.S.2d 565, 780 N.E.2d 166); *see Seiden Assocs., Inc. v. ANC Holdings, Inc.,* 959 F.2d 425, 426 (2d Cir.1992) ("When the meaning of a contract is litigated, a reviewing court ordinarily looks only at the words used by the drafters, who presumably understood what they intended."). To insure that the parties' intent controls, the standard for granting summary judgment in contract cases focuses on the review of the contract's language and the clarity with which the parties' intent is conveyed. A court may grant summary judgment "in those instances in which the contract's words, in and of themselves, convey a definite and precise meaning absent any ambiguity." *Gruppo, Levey & Co. v. ICOM Info. & Commc'ns, Inc.,* No. 01 Civ. 8922, 2003 WL 21511943, at *5 (S.D.N.Y. July 1, 2003) (citing *Seiden,* 959 F.2d at 428); *see also Mellon Bank, N.A. v. United Bank Corp. of N.Y.,* 31 F.3d 113, 115 (2d Cir.1994) ("Summary judgment is only proper in contract disputes if the language of the contract is 'wholly unambiguous.'" (quoting *Wards Co. v. Stamford Ridgeway Assocs.,* 761 F.2d 117, 120 (2d Cir.1985))). "[A]mbiguity exists where a contract term could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally

understood in the particular trade or business." *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.,* 345 F.3d 154, 184 (2d Cir.2003) (internal quotation marks omitted). The law is clear that a contractual provision is not rendered ambiguous simply because two interpretations are technically possible; both interpretations must also be reasonable. *See State v. Home Indem. Co.,* 66 N.Y.2d 669, 671, 495 N.Y.S.2d 969, 486 N.E.2d 827 (1985). "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *W.W.W. Assocs., Inc. v. Giancontieri,* 77 N.Y.2d 157, 162, 565 N.Y.S.2d 440, 566 N.E.2d 639 (1990).

As set forth in LPHI's Counterclaims, LPHI interpreted the phrase "general financial advisory and investment banking services" to mean that Maxim would create a " 'credit facility' or 'warehouse facility' with which to buy and sell life insurance policies." (Counterclaims ¶¶ 8–9.) While it may be true that "general financial advisory and investment banking services" could be considered an ambiguous contractual term, LPHI's interpretation is unreasonable. The creation of a credit/warehouse facility is a specific duty that goes well beyond the tasks set forth in § 1 of the Agreement. Moreover, the Agreement specifically provides for compensation to Maxim in the event it secures debt financing for LPHI. Section 3(a) states that "fees ... shall be earned by and paid to Maxim by [LPHI] in connection with financings or transactions undertaken by [LPHI], the terms of which will be will be [sic] mutually agreed upon under separate advisory, placement agency and/or underwriting agreements." (Agreement § 3(a).) In his deposition, Peden acknowledged that the provision in § 3(a) was "broad enough to include any kind of financing...." (Babnick Reply Decl., Ex. 17 at 49:3–4.)

The Agreement is unambiguous insofar as it does not require Maxim to create a credit or warehouse facility. Had LPHI sought this specific function from Maxim, it could have included a provision in the Agreement. Thus, LPHI's argument that Maxim breached the Agreement by failing to create such a debt facility is without merit.

### ii. *Failure to Perform the Duties Set Forth in the Agreement*

LPHI also argues that Maxim failed to perform the duties set forth in § 1 of the Agreement and that this material breach excuses LPHI from delivering the shares of common stock pursuant to the Warrant. Based on the record before this Court, an issue of material fact remains as to whether Maxim did substantially perform under the Agreement.

As stated by the Court of Appeals: "The issue of whether a party has substantially performed is usually a question of fact and should be decided as a matter of law only where the inferences are certain." *Merrill Lynch,* 500 F.3d at 186; *accord Homebridge Mortg. Bankers Corp. v. Vantage Capital Corp.,* No. 06 Civ. 9465, 2008 WL 5146957, at *5 (S.D.N.Y. Dec. 5, 2008) (finding that, based on the record, the court could not rule on a motion for summary judgment that plaintiff substantially performed under the contract and that questions of fact remained); *Bear, Stearns Funding, Inc. v. Interface Group–Nevada, Inc.,* 361 F.Supp.2d 283, 295 (S.D.N.Y. 2005) ("[I]n most cases, the question of materiality of breach is a mixed question of fact and law-usually more of the former and less of the latter-and thus is not properly disposed of by summary judgment."); *F. Garofalo Elec. Co., Inc. v. N.Y. Univ.,* 300 A.D.2d 186, 189, 754 N.Y.S.2d 227 (N.Y.App.Div., 1st Dep't, 2002) ("The question of whether there has been substantial performance-or a breach-is to be deter-

mined, whenever there is any doubt, by the trier of fact.").

As detailed above, § 1 of the Agreement lays out various tasks that Maxim was supposed to perform in exchange in for both the $25,000 fee and the Warrant. During his deposition, Scott was asked how Maxim performed each task; his responses will be discussed in turn below.

(1) Familiarize itself, to the extent appropriate and feasible, with the business, operations, properties, financial condition, management and prospects of the Company

Scott testified that Maxim familiarized itself with LPHI's operations through "conversation[s] with management, through the reviews of their [10–Qs and 10–Ks], [and] through updates with investors that we introduced them to." (Babnick Decl., Ex. 4 at 126:15–18.) Scott further testified that he began to familiarize himself with LPHI as early as 2002, but really did not begin to do so in earnest until September 2004 and continued to do so through March or April 2005. (Id. at 128:3–16.) Scott claims that the process ended due to a poor fourth quarter earnings report released in January 2005 that made many potential institutional investors "reluctant to take part in talking to the company for a while, so [Scott] deemed it necessary that [Maxim] needed a quote/unquote cooling off period until [Maxim] could revisit the institutions again." (Id. at 128:20–129:12.)

(2) Advise the Company on matters relating to its capitalization, and (3) Evaluate alternative financing structures and arrangements

Scott tied these two tasks together and testified that he advised Pardo to consider either an equity offering if LPHI's stock reached a certain price or the creation of a settlement fund. (Id. at 132:23–133:12.)

(3) Assist the Company in developing appropriate acquisition criteria and identifying target industries

As to this provision, Scott testified that Maxim did not assist LPHI because it was something LPHI "felt was not necessarily supportive of the business plan, and internal organic growth of the existing model would be better suited." (Id. at 134:20–24.)

(4) Assist the Company in evaluating and make recommendations concerning the relationships among the Company's various lines of business and potential areas for business growth

Scott testified that this provision tied into the third provision insofar as it related to the creation of a fund. Maxim agreed with LPHI that "a fund which allowed them to make these investments on a proprietary basis would create [sic] the company in a much more lucrative capacity." (Id. at 136:10–13.) When asked how Maxim provided this service, Scott answered that Maxim "put together the PowerPoint, [and] we were prepared to fill out the fund's legal document, [but] a memorandum was not done . . . ." (Id. at 136:18–22.)

(5) Provide such other financial advisory and investment banking services upon which the parties may mutually agree

Maxim performed this final task by "just trying to help [LPHI] gain increased exposure [ ] within the investor community." (Id. at 137:13–14.)

LPHI sharply disputes the idea that Maxim performed any of the services set forth in the Agreement. In support of its position, LPHI relies on the testimony of Scott, Pastine, and Fiore. For example, after the release of LPHI's fourth quarter earnings report in January 2005, Scott testified that an effort was made to generate interest on the fund side. When asked what efforts were made, Scott said that

"[i]ntroductory phone calls [were made] to see if we could stimulate interest." (Conway Opp. Decl., Ex. H at 131:13–14.) Scott testified that he called Wasatch (an investment fund) and that Pastine and Fiore made a few calls to other potential investors as well. (*Id.* at 131:20–22.) He further testified that Pastine may have spoken to Greenwich Capital and may have tried to contact other funds. (*Id.* at 231:2–14.) Lastly, Scott testified that Fiore "would have been more involved in setting up road show meetings [which] would have been more on the equity side, if we would have launched a fund...." (*Id.* at 231:22–24.)

However, when Pastine testified, his recollection of his involvement with LPHI consisted of one, initial meeting with LPHI. At that meeting, Pastine said that he was pessimistic about LPHI's idea of raising capital by engaging in "asset-backed securitization." (*Id.*, Ex. I at 13:6–9.) Pastine testified that after the initial meeting he: did not work to create a fund for LPHI; did not work on any aspect of LPHI's business; and did not have any further input in the advisory agreement between Maxim and LPHI. (*Id.* at 14:15–15:8.) And, in his deposition, Fiore testified that he was not aware of the transaction set forth in the Agreement between Maxim and LPHI. (*Id.*, Ex. J at 20:22–25.) Lastly, the Agreement provided for LPHI to reimburse Maxim for any expenses incurred in connection with the engagement. (Agreement § 4.) But the only expense report submitted to LPHI consisted of Scott's travel expenses incurred when he visited LPHI to conduct due diligence in the fall of 2004. (Babnick Decl., Ex. 11.) Even though Peden authorized the payment of the expenses in April 2005, the question remains, if Maxim was performing, would not it have incurred more expenses? This question should be left to the trier of fact.

■■ Based on the inconsistent testimonies of Maxim's employees and the fact that Maxim incurred no expenses (other than Scott's travel expenses) in connection with the Agreement, an issue of material fact exists as to whether Maxim substantially performed pursuant to the Agreement. Accordingly, Maxim's motion for summary judgment granting its breach of contract claim and dismissing LPHI's counterclaim and affirmative defense of breach of contract is denied.

B. *LPHI's Fraudulent Inducement Claim*

In its first counterclaim, LPHI claims that Maxim, through Scott, fraudulently induced LPHI into entering the Agreement by "knowingly [misrepresenting to LPHI] that Maxim would take the actions described in the [Agreement]." (Counterclaims ¶ 37.) LPHI's claim, however, is repetitive of its breach of contract claim. What is more, LPHI has failed to provide any evidence, other than the self-serving statements of its officers, to support its fraudulent inducement claim.

■■ Under New York law, in order to prove fraudulent inducement, a plaintiff must show: "(i) the defendant made a material false representation, (ii) the defendant intended to defraud the plaintiff thereby, (iii) the plaintiff reasonably relied upon the representation, and (iv) the plaintiff suffered damage as a result of such reliance." *Lumbermens Mut. Cas. Ins. Co. v. Darel Group U.S.A. Inc.,* 253 F.Supp.2d 578, 583 (S.D.N.Y.2003). The "elements of a fraud claim must be shown by clear and convincing evidence." *Crigger v. Fahnestock and Co., Inc.,* 443 F.3d 230, 234 (2d Cir.2006). New York law also requires that a fraud claim, raised in a case that stems from breach of contract, be "sufficiently distinct from the breach of

contract claim." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 20 (2d Cir.1996) (citing *Papa's–June Music, Inc. v. McLean,* 921 F.Supp. 1154, 1162 (S.D.N.Y.1996)); *see Telecom Int'l Am., Ltd. v. AT & T Corp.,* 280 F.3d 175, 196 (2d Cir.2001) ("[U]nder New York law, where a fraud claim arises out of the same facts as plaintiff's breach of contract claim, with the addition only of an allegation that defendant never intended to perform the precise promises spelled out in the contract between the parties, the fraud claim is redundant and plaintiff's sole remedy is for breach of contract.") (citations and internal quotation marks omitted); *Gibraltar Mgmt. Co., Inc. v. Grand Entrance Gates, Ltd.,* 46 A.D.3d 747, 749, 848 N.Y.S.2d 684 (N.Y.App.Div., 2d Dep't, 2007) (affirming grant of summary judgment where plaintiff could not show that the "cause of action was [ ] sufficiently distinct from the breach of contract cause of action to constitute a separate cause of action"); *see also Kestenbaum v. Suroff,* 268 A.D.2d 560, 561, 704 N.Y.S.2d 260 (N.Y.App.Div., 2d Dep't, 2000) (same); *Rubinberg v. Correia Designs,* 262 A.D.2d 474, 475, 692 N.Y.S.2d 172 (N.Y.App.Div., 2d Dep't, 1999) (same). In *Bridgestone/Firestone,* the Court of Appeals for the Second Circuit set forth three ways by which a party could distinguish its fraud claim from its breach of contract claim. A plaintiff must either: "(i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Id.* at 20 (citations omitted). Here, LPHI fails to meet any of the exceptions.

■ First, Maxim and LPHI were parties to a contract, and it is well-settled in New York that "parties to a commercial contract do not ordinarily bear a fiduciary relationship to one another unless they specifically so agree." *Calvin Klein Trademark Trust v. Wachner,* 123 F.Supp.2d 731, 733–34 (S.D.N.Y.2000); *see EBC I, Inc. v. Goldman Sachs & Co.,* 5 N.Y.3d 11, 19–20, 799 N.Y.S.2d 170, 832 N.E.2d 26 (2005) ("Generally, where parties have entered into a contract, courts look to that agreement 'to discover ... the nexus of [the parties'] relationship and the particular contractual expression establishing the parties' interdependency.'" (quoting *Ne. Gen. Corp. v. Wellington Adv.,* 82 N.Y.2d 158, 160, 604 N.Y.S.2d 1, 624 N.E.2d 129 (1993))). Accordingly, because Maxim did not owe any special duty to LPHI, LPHI cannot satisfy the first Bridgestone/Firestone exception.

■ To satisfy the second *Bridgestone/Firestone* exception, the plaintiff must allege that the misrepresentation is "collateral or extraneous to the contract." *Bridgestone/Firestone,* 98 F.3d at 20; *see First Bank of the Americas v. Motor Car Funding, Inc.,* 257 A.D.2d 287, 690 N.Y.S.2d 17, 21 (1st Dep't 1999) ("[A] misrepresentation of present facts is collateral to the contract (though it may have induced the plaintiff to sign the contract) and therefore involves a separate breach of duty."); *see also Deerfield Commc'ns Corp. v. Chesebrough–Ponds, Inc.,* 68 N.Y.2d 954, 956, 510 N.Y.S.2d 88, 502 N.E.2d 1003 (1986). Here, while LPHI's contention that Maxim, through Scott, misrepresented that Maxim would create a "warehouse facility and then a fund for securitizing the life settlement policies purchased with this facility," (LPHI Opp. Br. at 13), may satisfy the second *Bridgestone/Firestone* exception, the claim fails for two reasons: (1) the alleged misrepresentation was not set forth in LPHI's counter claim sit was only later raised in LPHI's brief in opposition to Maxim's motion for summary judgment; and (2) even

assuming LPHI properly raised the claim in its counterclaims, LPHI has put forth insufficient evidence to create an issue of material fact.

■ LPHI alleges that Maxim misrepresented that it would "take the actions described in the [Agreement]" and that at the time the misrepresentations were made "Scott and Maxim were fully aware that they had no intention of performing as stated in the [Agreement]." (Counterclaims ¶¶ 37–38.) It is well-settled in New York, though, that a contract claim cannot be converted into a fraud claim by the addition of an allegation that the promisor intended not to perform when he made the promise. *See Papa's–June Music, Inc. v. McLean,* 921 F.Supp. 1154, 1160–61 (S.D.N.Y.1996) (compiling New York cases that hold that general allegations of a party entering into a contract while lacking the intent to perform it are insufficient to support a claim for fraud). Therefore, on the face of LPHI's Counterclaims, LPHI's claim for fraudulent inducement fails. But, in its opposition brief, LPHI tweaks its argument to allege that Maxim misrepresented its intention to create a warehouse facility to fund the securitization of life settlement policies. (LPHI Opp. Br. at 13.)

■ As an initial matter, because a party cannot amend its pleading through its opposition brief, this Court should not even consider LPHI's revised claim. *See Kearney v. County of Rockland,* 373 F.Supp.2d 434, 440 (S.D.N.Y.2005) (rejecting hostile work environment claim raised for the first time in opposition brief to motion for summary judgment); *Southwick Clothing LLC v. GFT (USA) Corp.,* No. 99 Civ. 10542, 2004 WL 2914093, at *6–7 (S.D.N.Y. Dec. 15, 2004) ("A com-

plaint cannot be amended merely by raising new facts and theories in plaintiffs' opposition papers, and hence such new allegations and claims should not be considered ..."); *Maharishi Hardy Blechman Ltd. v. Abercrombie & Fitch Co.,* 292 F.Supp.2d 535, 544 (S.D.N.Y.2003) ("A summary judgment opposition brief is not a substitute for a timely motion to amend the complaint."); *Beckman v. U.S. Postal Serv.,* 79 F.Supp.2d 394, 408 (S.D.N.Y. 2000) (stating that impleaded claims will not be considered in an opposition to summary judgment); *Bonnie & Co. Fashions Inc. v. Bankers Trust Co.,* 170 F.R.D. 111, 119 (S.D.N.Y.1997) (noting that "it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment"). Even assuming, however, that LPHI's Counterclaims could be liberally construed to include a properly pleaded claim for fraudulent inducement, LPHI has put forth insufficient evidence to survive summary judgment. In support of its claim, LPHI cites the declaration of Peden who swore that Scott "made express representations about what [Maxim] would and could do for LPHI if LHPI entered into the Agreement" and that "Maxim did not even attempt to perform as promised." (Peden Opp. Decl. ¶ 23.) LPHI put forth no documents or other evidence to support its claim.[5] The self-serving claim of Peden, an officer of LPHI, cannot create an issue of material fact. *See Gottlieb v. County of Orange,* 84 F.3d 511, 518 (2d Cir.1996) ("[Defendant] cannot defeat the [summary judgment motion] by relying on the allegations in his pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible. The motion 'will not be defeated merely ... on the basis of conjecture or surmise.' " (quoting *Bryant*

---

**5.** It should be noted that in its Counterclaims, LPHI referenced an October 26, 2004 e-mail message from Scott confirming that "Maxim intended to assist [LPHI] with the creation of

'fund' to purchase policies." (Counterclaims ¶ 15.) However, LPHI never submitted this e-mail message in support of this allegation.

*v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991))) (internal citations omitted). Moreover, Peden's statements in his deposition seem to contradict the allegations of fraud. For example, when asked whether the Agreement was "an agreement to raise funds for the company," Peden responded that "[i]t is an agreement to perform-for Maxim to provide general financial advisory and investment banking services." (Babnick Decl., Ex. 1 at 41:24–42:7.) When asked to set forth the basis for LPHI's fraudulent inducement claim, Peden responded "it is apparent from their lack of any material performance under the agreement that they never intended to do so in the first place." (*Id.* at 144:23–145:1.) From this, it appears that LPHI's fraudulent inducement claim is not based on any express misrepresentation and, instead, is based solely on its belief that Maxim never intended to perform, which, as discussed above, is an insufficient basis for fraud in New York. Accordingly, because LPHI has failed to show that Maxim made any misstatements of material fact collateral to the Agreement, LPHI cannot satisfy the second *Bridgestone/Firestone* exception.

As to the third and final exception of *Bridgestone/Firestone,* although LPHI seeks rescission of the Agreement, this claim for relief amounts to nothing more than a return of the $25,000 fee. Such damages are indistinguishable from the damages LPHI seeks from Maxim in its breach of contract claim. Accordingly, because LPHI has not pleaded "special damages [ ] caused by the misrepresentation [that are] unrecoverable as contract damages," LPHI fails to satisfy the third *Bridgestone/Firestone* exception. *Bridgestone/Firestone,* 98 F.3d at 20.

Because LPHI has not met any of the three exceptions set forth by the Court of Appeals in *Bridgestone/Firestone* which is

needed to plead a fraud claim in conjunction with a breach of contract claim, Maxim's motion for summary judgment dismissing LPHI's fraudulent inducement claim is granted.

### C. *LPHI's Affirmative Defenses*
#### i. *Meeting of the Minds*

Under New York law, a "meeting of the minds must include agreement on all essential terms." *Kowalchuk v. Stroup,* 61 A.D.3d 118, 121, 873 N.Y.S.2d 43 (N.Y.App.Div., 1st Dep't, 2009) (citing 22 N.Y. Jur.2d Contracts' § 31 (2009)). Stock warrants are "contracts entitling the holder to purchase a specified number of shares of stock for a specific price during a designated time period." *Reiss v. Fin. Performance Corp.,* 97 N.Y.2d 195, 198, 738 N.Y.S.2d 658, 764 N.E.2d 958 (2001). In *Reiss,* the New York Court of Appeals found that the warrants at issue contained "all the material provisions necessary to make them enforceable contracts, including number of shares, price, and expiration date, and were drafted by sophisticated and counseled business persons." *Id.* Here, the Agreement sets forth all of the material terms of the Warrant, including the price, the number of shares, the expiration date, and the right to a cashless-exercise option. LPHI argues that the material terms in dispute have to do with whether the Warrants were "performance-based" or "success-based." (LPHI Opp. Br. at 18.) However, as discussed above (*see supra* III.A.i), had this been a material issue for LPHI, it could have included the language in the Agreement. It chose not to and, instead, agreed to compensate Maxim with the $25,000 fee and the Warrant "[a]s consideration for Maxim's services pursuant to this Agreement...." (Agreement § 3 (Maxim's services are listed in § 1 of the Agreement).) Because all of the material terms regarding the Warrant are present in the Agreement, LPHI's meeting of the minds defense fails,

and Maxim's motion for summary judgment dismissing this affirmative defense is granted.

### ii. *Waiver and Estoppel*

The affirmative defense of waiver applies "only if the plaintiff intentionally and knowingly waived its right to recovery." *RST (2005) Inc. v. Research in Motion Ltd.*, No. 07 cv 3737, 2008 WL 5416379, at *7 (S.D.N.Y. Dec. 17, 2008) (citing *Onanuga v. Pfizer, Inc.*, 369 F.Supp.2d 491, 499 (S.D.N.Y.2005) (waiver "must be clear, unmistakable, and without ambiguity")). Where, as here, the contract contains a no waiver provision (*see* Agreement § 15), any waiver by either party must be in writing. *Kendall v. Kendall*, 44 A.D.3d 827, 829, 843 N.Y.S.2d 679 (N.Y.App.Div., 2d Dep't, 2007) (holding that plaintiff did not waive strict compliance with the contract because "the agreement included a 'no waiver' clause and required a written stipulation to alter the terms of the agreement," and plaintiff never signed such a waiver); *see also Bigda v. Fischbach Corp.*, 898 F.Supp. 1004, 1013 (S.D.N.Y.1995) ("No waiver can have occurred here, however, because clause 11 of the employment agreement ... states, 'No provisions of this Agreement may be modified, waived or discharged unless such waiver, modification or discharge is agreed to in writing signed by Employee and an officer of Employer,' and defendant has not produced a written waiver."); *Schmal v. McCulla*, 274 A.D.2d 339, 711 N.Y.S.2d 7, 9 (1st Dep't 2000) ("Under ¶ 12 of the agreement ... waiver of any provision may only be accomplished in a writing signed by the party to be charged, a condition not present."). Here, LPHI has not produced any written waiver excusing it from delivering the Warrants.

In addition, Maxim moved for summary judgment dismissing several of LPHI's affirmative defenses, and LPHI only briefed its meeting of the minds defense. Because LPHI did not address Maxim's arguments in its opposition brief, this Court deems those affirmative defenses abandoned. *See Taylor v. City of N.Y.*, 269 F.Supp.2d 68, 75 (E.D.N.Y.2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."). Accordingly, Maxim's motion for summary judgment dismissing LPHI's waiver and estoppel affirmative defenses is granted.

### iii. *Laches*

LPHI's affirmative defense of laches also fails. Laches "bars a plaintiff's equitable claim where he is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant." *Ivani Contracting Corp. v. City of N.Y.*, 103 F.3d 257, 259 (2d Cir.1997). Laches cannot be a defense to a legal action for damages if the action was commenced within the statute of limitations period. *See id.* (citing *United States v. Mack*, 295 U.S. 480, 489, 55 S.Ct. 813, 79 L.Ed. 1559 (1935)). The statute of limitations for a breach of contract action in New York is six years, and this action was filed three days after the alleged breach by LPHI. Accordingly, Maxim's motion for summary judgment dismissing LPHI's affirmative defense of laches is granted.

### CONCLUSION

For the foregoing reasons, Defendant Life Partners Holdings, Inc.'s motion for partial summary judgment [dkt. no. 35] is GRANTED in part and DENIED in part, and Plaintiff Maxim's cross-motion for summary judgment [dkt. no. 40] is GRANTED in part and DENIED in part. A triable issue of fact remains as to whether Maxim breached the Agreement by failing to perform the services enumerated in § 1 of the Agreement, thereby excusing LPHI's performance under the Agreement.

The parties shall confer and inform the Court by letter no later than February 24, 2010 how they propose to proceed.

SO ORDERED.