**H.L. GRANT and Patricia Grant, Plaintiffs,**

**v.**

**The UNITED STATES, Defendant.**

**No. 455–86 T.**

United States Claims Court.

June 23, 1988.

Daniel M. Grant, Austin, Tex., atty. of record, for plaintiffs.

Elizabeth D. DePriest, with whom was Acting Asst. Atty. Gen. William S. Rose, Jr., Washington, D.C., for defendant.

## OPINION

WIESE, Judge.

Section 83 of the Tax Code requires property which is received as compensation for services to be included in income at its fair market value measured without regard to any restriction "other than a restriction which by its terms will never lapse." I.R.C. § 83(a) (1982).

The taxpayer in this refund suit[1] exercised rights granted him under a non-qualified stock option[2] to acquire unregistered shares of a publicly traded corporation. Part of the shares so acquired were immediately resold in a private placement for an amount higher than their purchase price but for less than the market price of the publicly traded shares.

The issues which are presented here on cross-motions for summary judgment are (i) whether unregistered shares are burdened by a nonlapsing restriction within the meaning of Section 83, and, if not, (ii) whether Section 83 is constitutionally objectionable because it requires property that is subject to temporary restrictions to be valued, for income purposes, without regard to any actual diminution in value attributable to such restrictions. The court heard argument on the motions on June 3, 1988 at the conclusion of which it entered a ruling in the Government's favor. This opinion explains the basis for that ruling in further detail.

### FACTS

Plaintiff, H.L. Grant, served as president of Petty–Ray Geophysical Company, a wholly-owned subsidiary of Geosource, Inc. for the years 1973 through 1976. On November 8, 1976, plaintiff entered into a non-qualified stock option agreement with Geosource. This agreement, which related to plaintiff's performance of services at Geosource, granted him an option, open for a period of three years, to acquire 15,000 shares of the company's common stock for $10 per share. A stock split in 1977 increased the number of shares subject to the option to 22,500 and correspondingly decreased the cost per share.

In December of 1977, plaintiff exercised his option to purchase 22,500 shares of Geosource stock at the option price of $6.67 per share. In compliance with the option arrangement, plaintiff executed and filed with the company an investment letter reciting that the stock was being acquired for investment purposes and not for sale or distribution. The agreement between employer and employee also required that the stock certificate issued to plaintiff bear a

---

1. This case is brought in the name of H.L. Grant and his wife, Patricia Grant, because they filed jointly with the Internal Revenue Service in the tax year in question. However, H.L. Grant is the principal party in this suit; hence, this opinion will refer to him as the taxpayer or plaintiff.

2. The term "non-qualified" stock option plan refers to any stock option plan which does not qualify for favorable tax treatment (*i.e.* income deferral) otherwise accorded to option arrangements under specific sections of the Internal Revenue Code.

restrictive legend indicating that the shares were not registered with the Securities and Exchange Commission and could not be sold absent an effective registration or an opinion letter of counsel advising that such registration was unnecessary. The unregistered or "lettered" stock offered under the option agreement was subject to the conditions described in order for the transaction to qualify as a private offering exempt from registration requirements under § 4(2) of the Securities Act of 1933. 15 U.S.C. § 77d(2) (1982).

On the same day that he purchased the stock, plaintiff sold half of his acquired shares in a private placement to two unrelated individuals.[3] While publicly held shares of Geosource were trading on the New York Stock Exchange on that day for a low of $23.25 and a high of $23.50 per share, plaintiff sold his unregistered stock for $14 per share.

For the 1977 tax year, plaintiff reported ordinary income of $165,000 with regard to the exercise of the Geosource stock option. To arrive at that figure, he calculated the difference between the $6.67 per-share price paid under the option arrangement and the $14 per-share price realized in the private sale of the stock and multiplied that difference by the total number of shares acquired.

The IRS disagreed with this tax treatment. Upon audit, that agency determined that, in accordance with Section 83, the Geosource stock was to be valued on the basis of its public trading price on the date the option was exercised (*i.e.*, $23.375)[4] rather than on the basis of its private sale value. Consistent with this approach, the IRS further concluded that the private sale, having been concluded at a price less than market value (*i.e.*, $14.00) gave rise to a short term loss. The net of the transactions was an assessment of additional tax due in the amount of $77,995. This amount, together with the interest due thereon, was paid. After filing a timely

claim for refund, plaintiff waived the statutory notice of claim disallowance and filed suit for refund here on July 24, 1986.

## DISCUSSION

Plaintiff raises essentially two arguments. The first attacks the validity of the regulation implementing Section 83; the second attacks the validity of the statute itself. Neither contention has merit.

Section 83(a) of the Tax Code provides generally that when property is transferred in connection with the performance of services, the excess of the fair market value of the property over the amount paid for the property is includible as compensation in the gross income of the individual who performed the services. The section requires the fair market value of such property to be measured without regard to any restriction "other than a restriction which by its terms will never lapse." I.R.C. § 83(a)(1) (1982).

For purposes of Section 83 and the regulations issued thereunder, a restriction which by its terms will never lapse is referred to as a "nonlapse restriction" and is defined as follows:

a permanent limitation on the transferability of property—

(1) Which will require the transferee of the property to sell, or offer to sell, such property at a price determined under a formula, and

(2) Which will continue to apply to and be enforced against the transferee or any subsequent holder (other than the transferor). Treas.Reg. § 1.83–3(h) (1987).

The same regulation goes on to say that "[l]imitations imposed by registration requirements of State or Federal security laws or similar laws imposed with respect to sales or other dispositions of stock or securities are not nonlapse restrictions." *Id.*

With regard to this regulation, plaintiff argues that the exclusion of unregistered shares from the category of nonlapsing

---

**3.** The parties have stipulated that these were arms' length transactions, the price agreed upon having been established by negotiations between a willing buyer and a willing seller.

**4.** This figure represents the mean trading price on that day.

restrictions is factually incorrect and, hence, legally impermissible. The contention is that the diminished value of unregistered stock is a permanent aspect of such securities because—according to plaintiff—"[t]he only way to remove the restriction is to register the stock with the Securities and Exchange Commission." Additionally, it is argued that, in enacting Section 83, Congress had in mind to reach only contractually-based restrictions on value and not those resulting from conditions imposed by law. Plaintiff is wrong on both counts.

■ Unregistered stock, or what is more typically called "restricted securities," refers to shares of stock that were not acquired through a public offering. 17 C.F. R. § 230.144(a)(3)(1987). Under the provisions of Rule 144 of the Securities Act of 1933, restricted securities may be resold in limited amounts through ordinary transactions in the public trading market after a 2–year holding period, provided current information concerning the issues is publicly available. 17 C.F.R. § 230.144(c) & (d) (1987); *see generally* L. Soderquist, *Understanding the Securities Laws* 163 (1987). Contrary to plaintiff's assertions then, where the requirements of Rule 144 are met, registration of a restricted security is not a condition to its resale. Since the shares become freely marketable after a two-year holding period, there can be no merit to the argument that the shares are burdened by a nonlapsing restriction.

■ Equally without merit is plaintiff's contention that, in the enactment of Section 83, Congress meant to reach only contractually-imposed restrictions on property transferability and not restrictions imposed by law. The words of the statute do not support such a distinction; they distinguish restrictions only on the basis of their permanency, not on the basis of their source.

Nor does the legislative history of the statute lend any comfort to plaintiff's argument. To the contrary, the pertinent Senate report, S.Rep. No. 552, 91st Cong., 1st Sess. 119, *reprinted in* 1969 U.S.Code Cong. & Ad.News 2027, 2150, makes it clear that restricted stock options of the sort we deal with here were the precise concern of Section 83.

As this report explains, the aim of the legislation was to correct the imbalance in existing law which accorded preferential tax treatment—the deferral of income—to restricted stock when paid to individual employees while simultaneously requiring the recognition of income when such stock was transferred to a non-qualifying employee trust. In Congress' view, this difference in treatment simply facilitated the use of restricted stock plans as a compensation deferral mechanism—a result squarely at odds with the more rigorous requirements for such favorable tax treatment which the revenue statutes demanded of qualified stock option plans.

After noting the disparity in tax treatment, the report goes on to say:

It has been suggested by some that restricted stock plans are not in fact, deferred compensation arrangements, but rather are a means of allowing key employees to become shareholders in the business. This line of reasoning, however, overlooks the fact that in 1964 Congress specifically dealt with the matter of the appropriate means by which key employees could be provided with a stake in the business when it revised the treatment of qualified employee stock options.

A series of specific requirements were provided by Congress at that time which *must be satisfied in order to obtain* favorable tax treatment in the case of stock options. A number of these requirements were designed to decrease the compensatory nature of stock options and to place more emphasis on stock options as a means of giving employees a stake in the operation of their business. Agreeing with the House bill, the committee does not believe it was intended that substantially similar tax benefits should be available under a slightly different type of arrangement, such as a restricted stock plan, where none of the conditions which it specified for qualified stock options must be satisfied.

To the extent that a restricted stock plan can be considered a means of giving

**42**

employees a stake in the business, the committee believes the present tax treatment of these plans is inconsistent with the specific rules provided by Congress in the case of qualified stock options, which were considered by Congress as the appropriate means by which an employee could be given a shareholder's interest in the business. *Id.* at 120–121, 1969 U.S.Code Cong. & Ad.News at 2151–52.

Considering the words of Section 83 as well as its legislative history, there is no basis for crediting plaintiff's argument that restricted stock arrangements are beyond the intended reach of the statute.

■ Plaintiff has also raised the argument that Section 83 is not constitutionally tenable because it provides for an irrebuttable presumption of value, that is, it requires property to be taken into income at a value that disregards any actual diminution in market price attributable to its temporary limited liquidity. Plaintiff argues that the true value of the shares he received was established by the price he received upon the resale of half of his shares, namely $14 per share. This, he claims, is the only value that is economically sound; hence, to require a recognition of income beyond the actual market value is unconstitutionally arbitrary and irrational.

Plaintiff's argument is not a new one. The same contention was considered in *Sakol v. Commissioner,* 574 F.2d 694 (2d Cir.1978) and was there found wanting. Plaintiff offers no additional arguments that would persuade us to come to a different result here.

In brief, *Sakol* holds that, in the realm of economic matters, Congress may enact legislation incorporating an irrebuttable presumption where the legislation (i) addresses a legitimate concern of the legislature, (ii) demonstrates a rational connection between the facts proven and the fact presumed, and (iii) represents a reasonable means of dealing with an issue when evaluated in light of the administrative burdens that would present themselves if a more individualistic approach were followed.

In concluding that Section 83 met these requirements when applied to the valuation of transfer-restricted shares acquired pursuant to an employee stock option plan, the court of appeals gave essentially three reasons. First, it observed that, prior to the enactment of Section 83, most stock transfer restrictions were cooperative endeavors undertaken with the aim of providing a tax benefit to the employee rather than furthering purely corporate objectives. Hence, the court saw in Section 83(a):

a reasonably well tailored means of defeating a device the only business purpose of which could be to pay employees with dollars that, because they may be tax-free or tax-favored, may be fewer. *Id.* at 699.

Next, the point was made that the transfer restriction was always either expressly or impliedly waivable by the corporation. This waiver power, said the court:

thus renders the amount of value depreciation both speculative and dependent upon the subjective intentions of the parties to the plan. Congress was therefore justified in adopting non-individualistic means ... because the factual determinations otherwise necessary accurately to value the shares would depend upon matters entirely within the knowledge and control of the corporate employer and its employee. Since a corporation ... could always release its employee from the restrictions, determining share value with any degree of certainty would be most difficult, expensive and, to the tax collector, administratively inordinately inconvenient. *Id.* (citation omitted).

And finally, in what it called a "not insignificant" factor, the court noted:

that those who choose to participate in a restricted stock option purchase plan do so voluntarily, presumably aware of Section 83(a)'s tax consequences. That taxpayers participate in such plans with open eyes minimizes the arbitrariness which flows from the lack of perfect fit between the congressional means and its purpose. *Id.*

Keeping in mind that "the Constitution [does not] require that legislation on eco-

nomic matters be compatible with sound economics or even with normal fairness," *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 44, 96 S.Ct. 2882, 2906, 49 L.Ed.2d 752 (1976) (Powell, J. concurring), we think the reasons given in *Sakol* in favor of Section 83's constitutionality are unassailable. This court, therefore, rejects plaintiff's contention to the contrary.

## CONCLUSION

Based on the foregoing analysis, plaintiff's motion for summary judgment is denied. Defendant's cross-motion for summary judgment is granted and the Clerk is directed to enter judgment dismissing the complaint.