09-4869-cv
Gudmundsson v.United States

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2010

Argued: September 20, 2010    Decided: February 11, 2011

Docket No. 09-4869-cv

---

OLAFUR GUDMUNDSSON, SALLY A. RUDRUD,

*Plaintiffs-Appellants*,

v.

UNITED STATES OF AMERICA,

*Defendant-Appellee*.

---

Before:  CALABRESI, KATZMANN, and CHIN, *Circuit Judges*.

Appeal from a judgment of the United States District Court for the Western District of New York (David G. Larimer, *J.*) dismissing plaintiffs-appellants' claim for a tax refund. Plaintiffs-appellants argued that they prematurely recognized and significantly overvalued property received in connection with the performance of services. The district court disagreed and granted summary judgment to the government.

AFFIRMED.

> ARNOLD R. PETRALIA, Petralia, Webb & O'Connell, P.C., Rochester, New York (Kenneth L. Greene, *on the brief*), *for Plaintiffs-Appellants*.
>
> ELLEN PAGE DELSOLE, Attorney, United States Department of Justice, Tax Division (William J. Hochul, Jr., United States Attorney for the

Western District of New York, *of counsel*), *for* John A. DiCicco, Acting Assistant Attorney General, *for Defendant-Appellee*.

CHIN, *Circuit Judge*

In 2000, plaintiffs-appellants Olafur Gudmundsson ("Gudmundsson") and Sally Rudrud (together, "plaintiffs")[1] jointly filed their 1999 federal tax return, reporting income earned on stock Gudmundsson received as compensation from his employer, Aurora Foods, Inc. ("Aurora"), on July 1, 1999. The stock was subject to several contractual and legal restrictions that impeded its marketability for one year -- by which point the company's stock value had plummeted. Plaintiffs sought to amend the tax return and obtain a refund, asserting that they had prematurely reported the stock and significantly overvalued it as income under § 83 of the Internal Revenue Code (the "I.R.C."). After exhausting their administrative remedies, they brought this action against the government in the Western District of New York. In a thoughtful and thorough decision, the district court (Larimer, *J.*) granted summary judgment in favor of the government. We affirm.

### STATEMENT OF THE CASE

#### A.  *The Facts*

The parties stipulated to the following facts before the district court.

---

[1]  Plaintiffs were married at all relevant times. They are now divorced but have pursued this claim together.

- 2 -

At all relevant times, Gudmundsson was an officer of Aurora, which marketed food products under brand names such as Aunt Jemima, Duncan Hines, and Van de Kamp. Shortly after a corporate reorganization, Aurora made an initial public offering of 14,500,000 registered shares of common stock on July 1, 1998 (the "IPO"). Gudmundsson became entitled to 73,105 unregistered shares (the "Stock") by virtue of his participation in Aurora's incentive compensation plan. The plan provided for the Stock to be distributed to him one year from the date of the IPO, on July 1, 1999. Gudmundsson received the Stock as planned.

Aurora subsequently provided Gudmundsson a W-2 that calculated his income from the distribution to be a little less than $1.3 million. This figure reflected the mean price of unrestricted shares of Aurora stock trading on the New York Stock Exchange (the "Exchange Price") on July 1, 1999: $17.6875. Gudmundsson reported this amount as income under I.R.C. § 83 -- which governs the taxation of property transferred in connection with the performance of services -- in the federal tax return he filed jointly with his then-wife, on or before April 15, 2000.

Gudmundsson held the Stock subject to several constraints. First, these were "restricted securities" under Securities and Exchange Commission ("SEC") Rule 144, 17 C.F.R. § 230.144(a)(3)(i), meaning they were acquired directly from the issuer and not in a public offering, id. Under Rule 144, the Stock could not be sold on a public exchange until the expiration of a holding period that, in Gudmundsson's case, ended on July 1, 2000.

*See Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 213 (3d Cir. 2006) (discussing the operation of Rule 144). The Stock could, however, be disposed of in a private placement sale or pledged as security or loan collateral. *See McDonald v. Comm'r*, 764 F.2d 322, 323 n.3 (5th Cir. 1985) (citing 17 C.F.R. § 230.144(a)(3)).

Second, the Stock was subject to an agreement among Aurora's various corporate entities and employee "members," including Gudmundsson (the "Agreement"). The Agreement prohibited, *inter alia*, the public disposition of the Stock before the second anniversary of the IPO, July 1, 2000. Until then, transfers could be made only to a group of "permitted transferees," which included family members and relatives. Permitted transferees were bound by the Agreement and had to agree in writing to abide by its terms. Aurora would treat any transfers other than to permitted transferees as null and void, and in some instances it could intervene to stop a forbidden transfer. Forfeiture of the Stock, however, was not one of the penalties contemplated for violations of the Agreement, whether by Gudmundsson or a permitted transferee.

Finally, Gudmundsson was subject to Aurora's Insider Trading Policy (the "Policy"). Among other things, the Policy required compliance with certain waiting periods and consent procedures prior to trading Aurora stock. Violation of the Policy could result in disciplinary action, including termination of employment.

Conditions at Aurora deteriorated in the year between

- 4 -

Gudmundsson's receipt of the Stock and expiration of the restrictions imposed by the Agreement and Rule 144. Unrestricted shares of Aurora stock -- which had been worth $17.6875 per share on July 1, 1999 -- lost a quarter of their value over three days that November following the company's announcement that it would not meet estimated fourth quarter earnings. By December 31, 1999, the Exchange Price had fallen to $9.25.

In February 2000, Aurora's auditors discovered irregularities in the company's financial statements, and the board of directors announced the formation of a committee to investigate Aurora's accounting practices and the possibility of fraud. Several senior-level executives resigned.[2] The Exchange Price tumbled another fifty percent. That April, Aurora announced an $81 million downward adjustment in pretax earnings previously reported for most of 1998 and 1999. By the time the Stock was freely marketable on July 1, 2000, the Exchange Price had fallen to $3.8375, a decline of almost $14 in one year.

B. *Prior Proceedings*

In 2003, plaintiffs filed an amended tax return, claiming a refund of $301,834 plus interest based on the mean Exchange price of Aurora stock on December 31, 1999,[3] rather than the price on

---

[2] Eventually, the executives responsible for the wrongdoing were indicted and pled guilty to securities fraud and related charges. Gudmundsson was not involved, and there is no evidence that he had knowledge of the misconduct.

[3] This amount was based on a mistaken Exchange Price of $7.5625. The Exchange Price on December 31, 1999 was actually $9.25.

July 1, as originally reported. The Internal Revenue Service (the "IRS") disallowed the claim in 2006. On March 20, 2008, plaintiffs filed this refund action below, pursuant to 28 U.S.C. § 1346(a)(1) and 26 U.S.C. § 7422.

In the proceedings before the district court, the parties agreed that the transaction was governed by I.R.C. § 83 and that the Stock was "transferred" to Gudmundsson within the meaning of that provision on July 1, 1999. They disagreed as to when the Stock became taxable income. The government argued that the original tax return had properly reported the Stock on July 1, 1999, and properly used the Exchange Price that day as the measure of value. Plaintiffs contended that they had been premature to treat the Stock as income on July 1, 1999, given the restrictions still encumbering it at the time. Alternatively, they argued that if July 1, 1999 was the correct recognition date, then the Stock should not be treated as if it could be sold at the same price as Aurora's unrestricted shares.

The parties cross-moved for summary judgment. On October 27, 2009, the district court (Larimer, *J.*) entered summary judgment in favor of the government, holding that the Stock was reportable as of July 1, 1999 and that the day's Exchange Price was an appropriate basis for measuring the income received. *See Gudmundsson v. United States*, 665 F. Supp. 2d 227, 236-39 (W.D.N.Y. 2009). This appeal followed.

– 6 –

**A.    *Standard of Review***

This Court reviews a decision granting summary judgment
de novo.  *Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield
of N.J., Inc.*, 448 F.3d 573, 579 (2d Cir. 2006).  Summary judgment
is appropriate "if there is no genuine issue as to any material
fact, and if the moving party is entitled to a judgment as a matter
of law."  *Allianz Ins. Co. v. Lerner*, 416 F.3d 109, 113 (2d Cir.
2005) (citing Fed. R. Civ. P. 56(c)).  The facts of this case were
stipulated and therefore only questions of law are presented.

**B.    *Taxation of Property under I.R.C. § 83***

At the heart of this case is I.R.C. § 83, which governs
the taxation of property transferred in connection with the
performance of services.[5]  Section 83 was enacted as part of the

---

[5]    Section 83(a) provides:

If, in connection with the performance of
services, property is transferred to any
person other than the person for whom such
services are performed, the excess of--

(1) the fair market value of such
property (determined without regard to any
restriction other than a restriction which by
its terms will never lapse) at the first time
the rights of the person having the
beneficial interest in such property are
transferable or are not subject to a
substantial risk of forfeiture, whichever
occurs earlier, over

(2) the amount (if any) paid for such
property,

shall be included in the gross income of the

- 7 -

Tax Reform Act of 1969, Pub. L. No. 91-172, 83 Stat. 487 (1969).

It was designed to "curb the use of sales restrictions to defer taxes on property given in exchange for services," *Robinson v. Comm'r*, 805 F.2d 38, 41 (1st Cir. 1986), which had become a popular practice among corporations and their employees.  The provision's general rule, set forth in § 83(a), has both a timing element and a valuation element.  As a matter of timing, property received as compensation is to be recognized as income as soon as the recipient's rights therein are "transferable" or no longer "subject to a substantial risk of forfeiture," whichever happens first. I.R.C. § 83(a); *see also* Treas. Reg. § 1.83-3(b).  The value of the income received is the property's "fair market value," measured without regard to any restriction, "other than [a] restriction which by its terms will never lapse," I.R.C.    § 83(a) -- also known as a "nonlapse" restriction, as distinguished from one that will "lapse," *see* Treas. Reg.    § 1.83-3(h), (i).

Both the timing and valuation components are at issue in this case, which presents two questions:   (1) when was it appropriate to recognize the Stock as taxable income?, and (2) what was its fair market value on that date? We address these issues in turn.

person who performed such services in the first taxable year in which the rights of the person having the beneficial interest in such property are transferable or are not subject to a substantial risk of forfeiture, whichever is applicable.

I.R.C. § 83(a).

1.    *The Recognition Date*

Plaintiffs argue that the district court erred in recognizing the Stock as income on July 1, 1999. They contend that the restrictions still in force on that date rendered it both non-transferable and subject to a substantial risk of forfeiture.[4] To survive summary judgment, plaintiffs needed to show the existence of both these conditions, as § 83(a) recognizes property as soon as either is lifted. The district court, however, concluded that the Stock was both transferable and not subject to a substantial risk of forfeiture on July 1, 1999. For the reasons that follow, we agree.

a.    *Transferability and Substantial Risk of Forfeiture*

Section 83(c)(1) provides that property is subject to a "substantial risk of forfeiture" when the "rights to full enjoyment of such property are conditioned upon the future performance of substantial services by any individual." I.R.C. § 83(c)(1). The regulations further explain that the existence of such a risk "depends upon the facts and circumstances" of each case. Treas. Reg. § 1.83–3(c)(1). It exists where rights "are conditioned, directly or indirectly, upon the future performance (or refraining from performance) of substantial services by any person, or the

---

[4]    Plaintiffs argue for alternative recognition dates -- *e.g.*, December 31, 1999, July 1, 2000 -- that we need not address because we agree with the district court that the Stock was reportable on July 1, 1999. This date was stipulated to be the date of the Stock transfer, and it was the one reported on plaintiffs' original tax return. We note, however, that it was not necessarily the first day on which the Stock was reportable under § 83. *See Gudmundsson*, 665 F. Supp. 2d at 232 n.2.

– 9 –

occurrence of a condition related to a purpose of the transfer, and the possibility of forfeiture is substantial if such condition is not satisfied." *Id.* For example, where the property is received "subject to a requirement that it be returned if the total earnings of the employer do not increase, such property is subject to a substantial risk of forfeiture." *Id.* § 1.83-3(c)(2). On the other hand, circumstances that do not constitute a substantial risk of forfeiture include the risk that the property's value will decline, as well as a requirement that the property be returned if the recipient is discharged for cause or for committing a crime. *Id.* § 1.83-3(c)(1), (2).

Substantial risks of forfeiture are also built into the definition of transferability. Property is "transferable" under § 83(c)(2) "only if the rights in such property of any transferee are not subject to a substantial risk of forfeiture." I.R.C. § 83(c)(2). The regulations explain that "transferable" property can be sold, assigned, or pledged "to any person other than the transferor" without that person also incurring a substantial risk of forfeiture. Treas. Reg. § 1.83-3(d). Transferability is not a demanding standard, as the ability to transfer to even one transferee free of that substantial risk is presumed to constitute "transferability," even though it may not also mean full marketability. *See Horwith v. Comm'r*, 71 T.C. 932, 939-40 (1979).

Finally, § 83 contains a "[s]pecial rule[]" for "[s]ales which may give rise to suit under section 16(b) of the Securities Exchange Act of 1934," providing that if the sale of property given

as compensation at a profit could subject a person to suit under § 16(b), that person's rights in the property are deemed to be subject to a substantial risk of forfeiture and not transferable. I.R.C. § 83(c)(3).[5]

b. *Application to the Stock*

(1) *Substantial Risk of Forfeiture*

We are not persuaded by plaintiffs' arguments that the Stock was subject to a substantial risk of forfeiture on July 1, 1999. Plaintiffs first argue that under the circumstances, the risk of termination Gudmundsson faced if he failed to comply with the Policy constituted a substantial risk of forfeiture. Section 83 is concerned with the forfeiture of interests in *property*, however, not in *employment*, and a substantial risk of forfeiture requires that those property interests be capable of being lost. *See Merlo v. Comm'r*, 492 F.3d 618, 622 (5th Cir. 2007); *Theophilos v. Comm'r*, 85 F.3d 440, 447 n.18 (9th Cir. 1996) (inquiring into "the chances [that] the employee will lose his rights in property transferred by his employer" to determine substantial risk of forfeiture (emphasis omitted)). Therefore, the risk of termination

---

[5] The parties agree that at all relevant times Gudmundsson was an "insider" within the meaning of § 16(b). *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) ("An 'insider' is . . . a beneficial owner of more than ten percent of any class of the company's non-exempt, registered equity securities, or a director or officer of the company issuing the stock." (citing 15 U.S.C. § 78p(a), (b)). In the district court, plaintiffs asserted that the Stock came within § 83(c)(3) on July 1, 1999 because Gudmundsson could have been subject to a § 16(b) suit at that time. The district court disagreed. *See Gudmundsson*, 665 F. Supp. 2d at 230, 234-35. Because plaintiffs do not appeal this aspect of the decision, we do not address it.

of employment is relevant under § 83 only if it has a causal connection to the loss or potential loss of rights in the property given as compensation.  *See Merlo*, 492 F.3d at 622 (termination for violating insider trading policy "was not enough to cause [taxpayer] to forfeit the shares").  No such connection exists here.  The Agreement did not provide that termination for violation of the Policy -- or termination for any reason at all -- would or could result in the forfeiture of the Stock.  We therefore reject plaintiffs' argument.

Second, plaintiffs argue that Gudmundsson would be exposed to a suit under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b),[6] if he transferred the Stock on July 1, 1999, and that this created "facts and circumstances" evidencing a substantial risk of forfeiture, Treas. Reg. § 1.83-3(c), analogous to the risk of suit under § 16(b), *see* I.R.C.       § 83(c)(3).

We hold that the district court correctly rejected the argument, as we conclude that Congress has already indicated that § 10(b) does not create a substantial risk of forfeiture under   § 83.  *See Merlo*, 492 F.3d at 622 ("For civil suits such as     [§ 10(b)] to be considered within the definition of a substantial risk of forfeiture, Congress would have to amend § 83."); *United States*

---

6       Under § 10(b), it is unlawful to "use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance" in violation of SEC rules, including rules against insider trading and fraud.  15 U.S.C. § 78j(b); *see* 17 C.F.R. § 240.10b-5.  Because we hold that liability under this provision does not create a substantial risk of forfeiture under § 83, we need not decide whether Gudmundsson could have been the subject of such a suit.

*v. Tuff*, 469 F.3d 1249, 1256 (9th Cir. 2006). Congress inserted directly into the statutory text a "[s]pecial rule[]" using language that refers only to suits under § 16(b), and by doing so it indicated "that civil suits are not generically covered by I.R.C. § 83." *Tuff*, 469 F.3d at 1256; *see* I.R.C. § 83(c)(3). We therefore reject plaintiffs' effort to use the regulations' "facts and circumstances" analysis to bootstrap § 10(b) liability into § 83.

### (2) *Transferability*

The Stock was not subject to a substantial risk of forfeiture on July 1, 1999, and although this is enough for income recognition under § 83, we briefly address plaintiffs' arguments regarding the transferability of the Stock, as well. As a preliminary matter, plaintiffs stipulated -- and the Agreement was clear -- that Gudmundsson could transfer the Stock to "permitted transferees," which included his family members and relatives, any of whom were "person[s] other than [Aurora,] the transferor," *see* Treas. Reg. § 1.83-3(d). Plaintiffs assert, however, that the Stock was not transferable because "in reality, . . . [t]he various restrictions imposed by law and agreement made [the Stock] impossible to sell." Pls.' Br. 24. Regardless of whether this is true, the argument misunderstands what § 83 requires. Transferability is not just a question of marketability. In fact, even if sales are prohibited for a period of time, property may be transferable if it can be pledged or assigned. *See Tanner v. Comm'r*, No. 02-60463, 2003 WL 21310275, at *2 (5th Cir. Mar. 26,

– 13 –

2003); *see also* Treas. Reg.  § 1.83-3(d).

        We also reject plaintiffs' effort to analogize the Agreement's transfer restrictions to those in *Robinson v. Commissioner*, 805 F.2d 38 (1st Cir. 1986).  In *Robinson*, the First Circuit concluded that the stock at issue was not transferable because it had been received subject to an agreement that contained a mandatory sell back provision prohibiting any disposal of the shares other than to the employer for one year.  *Id.* at 39.  In short, for Robinson to transfer the stock "to any person other than the transferor," Treas. Reg. § 1.83-3(d), he would be forced to breach the agreement, *Robinson*, 805 F.2d at 42.  By contrast, here the Agreement permitted at least some transfers during the restricted period.  Further -- as plaintiffs stipulated below -- the Agreement did not provide for the Stock to be forfeited if Gudmundsson or a transferee violated its terms.  The agreement in *Robinson*, however, gave the employer the power to recoup the stock after an event of noncompliance.  *Id.* at 39-40; *see Hernandez v. United States*, 450 F. Supp. 2d 1112, 1119 (C.D. Cal. 2006) (rejecting analogy to *Robinson* where agreement did not contain mandatory sell back provision).[7]  *Robinson* does not help plaintiffs' case and is not a reasonable analogue:  individuals saddled by more complete transfer restrictions than was Gudmundsson have been held to have transferable interests under § 83.  *See*

---

        [7]    In concluding that Robinson's stock could not be recognized under § 83(a) until these restrictions expired, the First Circuit held that transferability could not depend on "a hypothetical, back-door transfer in breach of the option agreement." *Robinson*, 805 F.2d at 42.  Rather, it must operate "on standard practices" and the "observance of contracts." *Id.*

*Tanner*, 2003 WL 1922926, at *2 (deeming stock to be transferable despite two-year moratorium on sales where taxpayer could and did give the stock to a relative).

To summarize, the district court was correct to recognize the Stock as income on July 1, 1999, as the Stock was transferable and not subject to a substantial risk of forfeiture on that day. This conclusion was correct under § 83(a) and in general, as income in whatever form is taxable in the year in which it is received, *Wolder v. Comm'r*, 493 F.2d 608, 612-13 (2d Cir. 1974); *see also Sakol v. Comm'r*, 574 F.2d 694, 700 (2d Cir. 1978), and stock is usually valued on the day it is issued, *United States v. Roush*, 466 F.3d 380, 385 (5th Cir. 2006); *cf. Wolder*, 493 F.2d at 612-13.

## 2. *The Fair Market Value of the Stock*

The remaining question is the value of the Stock on July 1, 1999. Section 83(a) recognizes property at its "fair market value (determined without regard to any restriction other than a restriction which by its terms will never lapse) . . . over . . . the amount (if any) paid for such property." I.R.C. § 83(a).[8]

Plaintiffs contend that the district court erred in two ways when it determined the fair market value of the Stock. First, they assert that, based on an erroneous reading of § 83(a), the court impermissibly departed from the traditional method of determining fair market value set forth in *United States v. Cartwright*, 411 U.S. 546 (1973). Second, they contend that

---

[8] As Gudmundsson did not pay for the Stock, the amount of income is only a question of its fair market value.

restrictions imposed by law, rather than by contract, cannot be considered "lapse" restrictions within the meaning of § 83(a). We consider these arguments in turn.

### a. *The Calculation of Fair Market Value under § 83*

In general, the term "fair market value" is understood to mean "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." *Cartwright*, 411 U.S. at 551 (quotation mark omitted); *accord United States v. Boccagna*, 450 F.3d 107, 115 (2d Cir. 2006). *Cartwright* articulated the "general understanding of fair market value used throughout the [I.R.C.] in the absence of a specific statutory rule." *Harrison v. United States*, 475 F. Supp. 408, 413 (E.D. Pa. 1979). For instance, this definition is used to value a decedent's estate under I.R.C. § 2031, *Cartwright*, 411 U.S. at 554–56, and to assess economic income for minimum tax purposes under I.R.C. §§ 56 and 57, *McDonald*, 764 F.2d at 322, 329; *Estate of Gresham v. Comm'r*, 752 F.2d 518, 523 (10th Cir. 1985).

Relying on these cases, plaintiffs contend that the fair market value of the Stock -- restricted by the Agreement, unregistered, and not yet publicly marketable -- is determined by the private market, as that is where the willing buyers exist. They argue that nothing in § 83 contains the "specific statutory rule" that requires using a method of computing fair market value other than *Cartwright*'s. *See McDonald*, 764 F.2d at 329 (expressing "a strong disinclination to disturb the established meaning of the

term 'fair market value' as it was enunciated" in *Cartwright*). This is incorrect. Section 83 is, of course, different from I.R.C. § 57 or I.R.C. § 2031, because it calls for fair market value to be "determined without regard to any restriction other than [one] which by its terms will never lapse." I.R.C. § 83(a)(1). The methods used to calculate fair market value under other I.R.C. provisions -- and the hypothetical value of the Stock under other I.R.C. provisions -- are irrelevant to its value under § 83(a). It is unsurprising therefore that plaintiffs cite no instances in which *Cartwright*'s definition of "fair market value" has been used to analyze "fair market value" under § 83: we have discussed before that this language unambiguously breaks from common usage, *Sakol*, 574 F.2d at 699-701, and every other court to consider the issue has agreed, *see, e.g.*, *Roush*, 466 F.3d at 386 ("[T]he fact that stock is restricted, or even specifically valued for the purposes of private sales at less than the fair market value, does not affect the valuation of the shares for [§ 83] purposes."); *McDonald*, 764 F.2d at 330, 340-41; *Pledger v. Comm'r*, 641 F.2d 287, 291, 293 (5th Cir. 1981); *see also Kolom v. Comm'r*, 454 U.S. 1011, 1016 (1981) (Powell, J., dissenting) ("[Section] 83 . . . modifies th[e] phrase [fair market value] with a parenthetical indicating that restrictions that lapse are to be ignored."); *Gresham*, 752 F.2d at 521-22. We therefore hold that the district court correctly rejected plaintiffs' argument and determined fair market value according to the directives of § 83(a).

## b. *Lapse and Nonlapse Restrictions*

On July 1, 1999, the Stock was subject to two transfer restrictions:  one imposed by contract (the Agreement) and one imposed by law (Rule 144).  The question is whether these restrictions "will never lapse" under § 83; only in that event would they be considered in determining value.  *See* I.R.C.       § 83(a)(1).  The regulations define a nonlapse restriction as "a permanent limitation on the transferability of property" that will (1) require the property to be sold "at a price determined under a formula," and (2) that will apply to all subsequent transferees.  Treas. Reg. § 1.83-3(h).[9]  The regulations also provide that "[l]imitations imposed by registration requirements of State or Federal security laws or similar laws imposed with respect to sales or other dispositions of stock or securities are not nonlapse

---

[9]     We note that § 83 is different from but not inconsistent with *Cartwright*'s core principle.  There, the Court rejected a regulation that taxed the decedent's mutual fund shares at the "asked" price -- the price "used by the [mutual] fund when selling its shares to the public" -- because, "[a]s a matter of statutory law [under the Investment Company Act of 1940], holders of mutual fund shares cannot obtain the 'asked' price from the fund." *Cartwright*, 411 U.S. at 552.  In other words, the regulation "purport[ed] to assign a value to mutual fund shares that the estate could not hope to obtain and that the fund could not offer." *Id.* at 553.  The more reasonable value was the "redemption" price, "the only price that a shareholder may realize and that the fund -- the only buyer -- will pay," which was, also as a matter of statutory law, somewhat less than the "asked" price. *Id.* at 552-53.

If the same issue had been considered under § 83(a), the result likely would have been the same.  Section 83(a) adjusts its method of calculating fair market value when property is subject to permanent pricing or transfer limitations that negatively affect its value -- nonlapse restrictions. *See* I.R.C. § 83(a).  A statutorily-set price that will run to all potential transferees is such a restriction. *See* Treas. Reg. § 1.83-3(h).

restrictions." *Id.* Applying these rules, the district court determined that the Agreement and Rule 144 both imposed restrictions that lapsed, and so disregarded them in calculating the fair market value of the Stock on July 1, 1999.

Plaintiffs argue that this was error. They argue that because § 83 does not explicitly say that securities laws lapse, these laws do not lapse, and that Treasury Regulation § 1.83-3(h) therefore unreasonably includes them in the statute's scope. The regulation contravenes what they claim was Congress's intention for lapse restrictions to include only contractually imposed restrictions, and not those imposed by law.

We disagree. The plain text of the statute broadly requires that "any restriction" be disregarded in valuing the property, limited only by the permanence of a particular restriction. Nothing in the statute indicates that Congress meant to further differentiate a restriction on the basis of its source.

Nor do we see any legitimate reason to infer such a distinction. Targeting restrictions was the point of § 83. For context, before the provision was enacted in 1969, restricted stock received preferential treatment in the I.R.C.[10] It "was taxed either when the restrictions lapsed or when the stock was sold," and the tax was levied "upon the difference between the purchase

---

[10] Under earlier law, the restrictions were "cooperatively imposed," allowing the employee to defer the payment of taxes until the restrictions lapsed while, at the same time, enjoying the voting and dividend benefits of shareholding. *Sakol*, 574 F.2d at 698-99. The corporate employer, meanwhile, could pay the employee "with dollars that, because they may be tax-free or tax-favored, may be fewer." *Id.* at 699.

price and the fair market value at the time of transfer or when the restrictions lapsed, whichever was less." *Alves v. Comm'r*, 734 F.2d 478, 481 (9th Cir. 1984). At the same time, and by contrast, contributions to employee pension plans and profit sharing trusts "were immediately taxable in the year of receipt." *Id.* Thus, "Congress's primary intention in enacting § 83 was to address the disparity created by the favorable treatment of restricted stock plans vis-a-vis other mechanisms for providing deferred compensation." *Theophilos*, 85 F.3d at 444; *see also Grant v. United States*, 15 Cl. Ct. 38, 41 (1988). The problem was essentially one of timing, and therefore Congress drafted a "blanket rule," *Sakol*, 574 F.2d at 699, that "ignor[ed] any value-depressing effect of [temporary] transfer restrictions" in computing income, *id.* at 698 n.14.

We previously addressed § 83 and its purpose in *Sakol*. At issue there was stock that was held subject to a temporary transfer restriction imposed by the plaintiff's stock purchase plan. *Id.* at 696. The IRS had taxed the stock, under § 83, without taking into account any temporary loss of value that might be caused by the transfer restriction. The plaintiff sued. We agreed with the Tax Court that the IRS's approach was constitutionally acceptable and held that restrictions "other than permanent, nonlapsing restrictions[] may not be considered in determining fair market value." *Id.* "Because nonqualified plans have been the vehicles of tax avoidance," we concluded, "Congress may clothe the tax incidental to them with a ready-made, rather than a custom-tailored, suit." *Id.* at 701.

The decision was addressed to the contract restrictions as well as the constitutional questions presented, but we did not hold, as plaintiffs now imply, that contract restrictions constitute the universe of lapsable restrictions under § 83. Nor was our holding interpreted that way, as *Sakol*'s reasoning was extended to legal restrictions shortly thereafter. *See, e.g.*, *Pledger*, 641 F.2d at 293; *Grant*, 15 Cl. Ct. at 41.

Plaintiffs are correct that contracts were the primary source of the problem the statute was designed to solve, but its plain language is not limited to contractual restrictions. Again, § 83 differentiates only on the basis of a restriction's permanence, not on its type or source. *See Grant*, 15 Cl. Ct. at 41. The statute's legislative history reveals that this was deliberate. In its proposal for what became § 83, the Treasury Department recommended that certain securities law restrictions be given the same treatment as those that never lapse. *Koss v. Comm'r*, 57 T.C.M. (CCH) 882, n.14 (Tax Ct. 1989). The proposal fared poorly:

> Both the House Ways and Means Committee and the Senate Finance Committee ignored the Treasury's recommendation and in their respective versions of section 83 provided that *only* a nonlapse restriction will affect a stock's fair market value for the purpose of income realization. The Treasury, having no choice but to comply with the wishes of Congress, provided in the proposed regulations to section 83 that registration requirements imposed by federal or state securities laws do not qualify as either nonlapse or substantial risk of forfeiture restrictions . . . .

Ronald Hindin, *Internal Revenue Code Section 83 Restricted Stock Plans*, 59 Cornell L. Rev. 298, 332 (1974) (footnotes omitted). It

is clear that the regulation plaintiffs challenge effectuates Congress's intent, as the regulation provides that "[l]imitations imposed by registration requirements of State or Federal security laws or similar laws imposed with respect to sales or other dispositions of stock or securities are not nonlapse restrictions." Treas. Reg. § 1.83-3(h).

In sum, we hold that all lapse restrictions -- whether imposed by contract or by law -- must be disregarded in calculating income under § 83. The district court was correct to disregard Rule 144, which was a restriction on the Stock's marketability that "by its terms" lapsed on July 1, 2000. *See* I.R.C. § 83(a)(1); *accord Grant*, 15 Cl. Ct. at 41 (holding that because Rule 144's restrictions will eventually expire, "there can be no merit to the argument that the shares are burdened by a nonlapsing restriction"). Stripped of restrictions, the Stock was like Aurora's unrestricted shares trading on the New York Stock Exchange on July 1, 1999, and the district court correctly used the Exchange Price to determine fair market value, which is how stock is typically valued under § 83(a), *see, e.g.*, *Roush*, 466 F.3d at 385-86; *Sakol*, 574 F.2d at 696, as well as in general, *see Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 385 (2d Cir. 2006); *E. Serv. Corp. v. Comm'r*, 650 F.2d 379, 384 (2d Cir. 1981); *Maxim Grp. LLC v. Life Partners Holdings, Inc.*, 690 F. Supp. 2d 293, 301 (S.D.N.Y. 2010).

Finally, we acknowledge, as we have before, that in the course of addressing restricted stock arrangements, Congress employed a rule that is "reasonably well tailored," but that can

operate unfairly in an individual case. *Sakol*, 574 F.2d at 699. This may be such a case, but this is the result § 83(a) contemplates. As we have previously noted, taxpayers participate in stock-based compensation plans voluntarily and "presumably aware of Section 83(a)'s tax consequences," *id.*, or at least that the risk of loss is part of any stock acquisition, *McDonald*, 764 F.2d at 339 n.29; *Pledger*, 641 F.2d at 291.

## CONCLUSION

We have considered plaintiffs' other arguments and conclude that they are without merit. The judgment of the district court is AFFIRMED.